Implus Footcare, LLC v. Vore, 2025 NCBC 55.

STATE OF NORTH CAROLINA

WAKE COUNTY

IMPLUS FOOTCARE, LLC and IM
GROUP HOLDINGS
CORPORATION,

Plaintiffs,

v.

TODD VORE, BLUE SAN, LLC, H.B.
SHOES CO., and THE MIKE HALE
COMPANY,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV020659-910

**ORDER AND OPINION ON
MOTION TO AMEND AND
MOTIONS TO DISMISS**

**THIS MATTER** is before the Court on Defendants H.B. Shoes Co. and The Mike Hale Company's Motion to Dismiss Second Amended Complaint (ECF No. 73); Defendants Todd Vore and Blue San, LLC's Motion to Dismiss Second Amended Complaint (ECF No. 76); Plaintiffs Implus Footcare, LLC and IM Group Holdings Corporation's Motion to Dismiss Blue San, LLC's Amended Counterclaims (ECF No. 68) (collectively, the "Motions to Dismiss"); and Plaintiffs Implus Footcare, LLC and IM Group Holdings Corporation's Motion for Leave to File Third Amended Complaint ("Motion to Amend," ECF No. 110, and together with the Motions to Dismiss, the "Motions").

Having considered the Motions, the parties' briefs, the arguments of counsel, the applicable law, and all other appropriate matters of record, the Court concludes that the Motion to Amend should be **GRANTED** and that the Motions to Dismiss should each be **GRANTED in part** and **DENIED in part** for the reasons set forth below.

*Kilpatrick Townsend & Stockton LLP by Elizabeth Winters, Richard Self, and Jason Wenker for Plaintiffs Implus Footcare, LLC and IM Group Holdings Corporation.*

*Foley Hoag LLP by Kristyn DeFilipp, Leah Rizkallah, and Jasmine Brown, and Morningstar Law Group by Harrison Gates for Defendants Todd Vore and Blue San, LLC.*

*Morningstar Law Group by Harrison Gates for Defendants H.B. Shoes Co. and The Mike Hale Company.*

Davis, Judge.

## INTRODUCTION

1. The parties in this highly contentious case, involving competitors within the footwear accessories and shoe care industry, have filed a veritable potpourri of claims against each other. At its most basic level, two competitors accuse each other of exceeding the limits of lawful competition while—not surprisingly—defending their own conduct as being well within those very same limits. In order to resolve the parties' dueling arguments, the Court must dive into the murky waters separating legitimate business conduct from unfair competition.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact in connection with a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the pleading and in documents attached to, referred to, or incorporated by reference in the pleading that are relevant to the Court's determination of the motion. *See, e.g., Window World of Baton Rouge, LLC*

*v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).[1]

## I.    Background

3.    Implus Footcare, LLC ("Implus") is a Delaware limited liability company with its principal place of business in Durham County, North Carolina.  (TAC ¶ 1; Blue San, LLC's Amended Counterclaims ("Amended Counterclaims"), ECF No. 54, ¶ 2.)  Implus is in the business of designing and distributing footwear accessories and shoe care products.  (TAC ¶¶ 20–21; Am. Countercls. ¶ 11.)

4.    IM Group Holdings Corporation ("IMGH") is a Delaware corporation with its principal place of business in Durham County, North Carolina.  (TAC ¶ 2; Am. Countercls. ¶ 3.)  IMGH is the parent company of Implus.[2]  (TAC ¶ 2; Am. Countercls. ¶ 3.)

5.    Defendant Todd Vore worked for Implus for decades in various capacities and most recently served as its president.  (TAC ¶¶ 24–26, 37–38; Am. Countercls. ¶ 14.)

6.    While working for Implus, Vore developed a professional relationship with two individuals named Hugh Bates and Mike Hale.  (TAC ¶ 72; Am. Countercls. ¶¶ 18–20.)

---

[1] As noted below, the Court is electing—in furtherance of judicial economy—to consider Defendants' arguments in support of their respective Motions to Dismiss as applied to Implus's proposed Third Amended Complaint ("Third Amended Complaint" or "TAC," ECF No. 110.1 [sealed]).  While the relevant factual allegations in the Third Amended Complaint are identical to those in the Second Amended Complaint ("Second Amended Complaint" or "SAC," ECF No. 59)—for clarity—this Opinion cites only to the factual allegations contained in the proposed Third Amended Complaint.

[2] Throughout this Opinion, Implus and IMGH are collectively referred to as "Implus."

7. Through their respective companies (Defendants H.B. Shoes Co. and The Mike Hale Company), for nearly a decade Bates and Hale served as Implus's independent contractor sales representatives for select retailers in the "Specialty-Family Channel" segment of the footwear accessories and shoe care market. (TAC ¶¶ 52–55, 58–59; Am. Countercls. ¶¶ 18–19.)

8. In early 2020, Vore decided to resign from his position as Implus's president and eventually terminated his employment with Implus altogether. (TAC ¶¶ 37–38; Am. Countercls. ¶ 14.)

9. The terms of Vore's resignation were memorialized on 28 February 2020 in a separation letter ("Separation Agreement," ECF No. 59.2) entered into between Vore and Implus. (TAC ¶ 39; Am. Countercls. ¶ 58.)

10. Among other things, the Separation Agreement addressed stock that Vore had received in IMGH by virtue of his position as Implus's president. (ECF No. 59.2, at 1–2.) Specifically, the Separation Agreement stated that all stock Vore had received in IMGH would be subject to the terms of the 30 April 2015 IM Group Holdings Corporation Stockholders Agreement ("IMGH Stockholders Agreement," ECF No. 59.1). (ECF No. 59.2, at 2.)

11. Vore's employment with Implus was effectively terminated on 4 March 2020. (TAC ¶ 38; Am. Countercls. ¶ 58.)

12. Following Vore's termination, Implus decided to terminate its contracts with H.B. Shoes Co. and The Mike Hale Company. (TAC ¶ 60; Am. Countercls. ¶¶ 19–20.)

13.     That same year, Vore joined with two former Implus employees, Richard Chang and Merrick Jones, to create Defendant Blue San, LLC ("Blue San"). (TAC ¶ 43; Am. Countercls. ¶¶ 6, 12–13.) Vore is currently a minority interest owner in Blue San. (TAC ¶ 44; Am. Countercls. ¶ 10.)

14.     Blue San is a North Carolina limited liability company with its principal place of business in Durham County, North Carolina. (TAC ¶ 4; Am. Countercls. ¶ 1.) Blue San designs, develops, and distributes various consumer products. (TAC ¶ 45; Am. Countercls. ¶ 6.)

## II.     Implus's Allegations

15.     Implus alleges that beginning in 2023, Vore—working with Blue San full-time as its Director of Sales, Marketing, and Operations—began preparing Blue San to enter the footwear accessories and shoe care market to compete with Implus. (TAC ¶¶ 46–47.)

16.     At the same time and pursuant to the IMGH Stockholders Agreement, however, Vore continued to receive quarterly "confidential" financial reports from Implus concerning its performance. (TAC ¶¶ 42, 48.) This information included management discussion and analysis, net revenue, gross margins, operating expenses, financial data related to Implus's customers, revenue and gross margins for each of Implus's brands, working capital and cash flow, EBITDA (earnings before interest, taxes, depreciation, and amortization) data, assets, liabilities, marketing expenses, personnel expenses, and financial results for each of IMGH's subsidiaries. (TAC ¶ 32.)

17.     Implus alleges that Vore never informed it of his affiliation with Blue San, continued to accept Implus's confidential financial information, and then used this information to assist Blue San in its efforts to compete with Implus.  (TAC ¶¶ 49–51.)

18.     In early 2024, Vore contacted Bates and Hale to enlist their assistance in marketing and selling Blue San's forthcoming footwear accessories and shoe care products.  (TAC ¶ 73.)

19.     Prior to their termination from Implus in 2020, Bates and Hale had been responsible for serving as independent contractor sales representatives for specific Implus customers in the Specialty-Family Channel market.  (TAC ¶¶ 55, 59, 75, 82.)

20.     Through their respective companies, Bates had entered into a 2012 Sales Representative Agreement ("2012 SRA," ECF No. 59.3), and Hale had entered into a substantively identical 2014 Sales Representative Agreement ("2014 SRA," 59.4).  (TAC ¶¶ 55, 58–59, 61.)

21.     Both the 2012 and 2014 SRAs contained confidentiality clauses in which Bates and Hale agreed to keep certain information relating to Implus and its clients confidential.  (TAC ¶¶ 56, 59; *see also* ECF No. 59.3, at 4; ECF No. 59.4, at 4.)

22.     However, even after Implus had terminated their contracts in 2020, Bates and Hale continued to "mistakenly" receive confidential brand overview reports from two of Implus's customers with whom they had previously worked.  (TAC ¶¶ 75, 82; *see also* ECF No. 74.4 [sealed]; ECF No. 95 [public].)  These brand overview reports were in the form of spreadsheets that included data concerning the sales

performance of each of Implus's products broken down by brand and style. (TAC ¶¶ 76, 83; *see generally* ECF No. 74.4 [sealed]; ECF No. 95 [public].)

23. Having previously worked with Bates and Hale through Implus, Vore knew the terms of the 2012 and 2014 SRAs. (TAC ¶¶ 72, 263.) Nonetheless, Vore (among others at Blue San) allegedly repeatedly requested that Bates and Hale violate their confidentiality agreements by sending Blue San copies of Implus's customers' brand overview reports. (TAC ¶¶ 74, 78, 80, 84–85; *see also* ECF No. 74.4 [sealed]; ECF No. 95 [public].)

24. Implus contends that this wrongful conduct constituted a conspiracy to misappropriate Implus's confidential information and benefit Blue San as a market competitor. (TAC ¶¶ 74, 280, 293.)

25. Not knowing about their affiliation with Vore and Blue San, in June 2024, Implus contacted Bates and Hale to discuss entering into new sales representative contracts with them. (TAC ¶ 62.)

26. Subsequently, on 17 June 2024, Bates and Hale signed—on behalf of their respective companies—the 2024 Sales Representative Agreements ("2024 SRAs," ECF No. 74.2), whereby they agreed to serve exclusively as Implus's sales representatives for specific clients in the Specialty-Family Channel market. (TAC ¶ 62–64; *see also* ECF No. 74.2.)

27. The 2024 SRAs were for a fixed three-year term and included various non-competition, non-solicitation, and confidentiality provisions. (TAC ¶¶ 65–67; *see also* ECF No. 74.2, at 3–4, 13.)

28.     Implus alleges that Bates and Hale entered into the 2024 SRAs without disclosing that they had already entered into competing agreements with Blue San and had been providing Vore and Blue San with Implus's confidential client information.  (TAC ¶¶ 68, 87.)

29.     Indeed, the 2024 SRAs included an express warranty provision whereby Bates and Hale represented that their signing of the 2024 SRAs would "not result in any violation of any agreement, instrument or contract" to which they were parties.  (TAC ¶¶ 69, 282, 295; ECF No. 74.2, at 2, 11.)  Based on the allegations raised in the Amended Counterclaims—claiming that Bates and Hale were, in fact, subject to "exclusive" agreements with Blue San—Implus contends that Bates and Hale knew that these representations in the 2024 SRAs were false at the time they were made.  (TAC ¶¶ 69, 282–83, 295–96.)

30.     Immediately upon entering into the 2024 SRAs, Implus began sharing additional confidential information about its clients with Bates and Hale.  (TAC ¶ 71.)

31.     Shortly thereafter, between 17 and 19 June 2024, Bates and Hale informed Vore and Blue San about the 2024 SRAs.  (TAC ¶ 87.)

32.     Implus alleges that Vore immediately began efforts to convince Bates and Hale to repudiate the 2024 SRAs.  (TAC ¶¶ 87–89.)

33.     On 19 June 2024, Vore informed Bates and Hale that he "sees the financials" for Implus—referencing the confidential information he received as an IMGH stockholder—and "cherry-picked" information to share with them, ultimately

deceiving Bates and Hale into believing that Implus was planning on "undercut[ting]" them. (TAC ¶¶ 88–90.)

34. Vore's efforts to persuade Bates and Hale were successful, and on that same day Bates and Hale informed Implus that they "should not have entered" into the 2024 SRAs and that they would not honor them. (TAC ¶¶ 91–92.)

35. This decision was confirmed by Bates and Hale's then-counsel who informed Implus that Bates and Hale had based their decision to repudiate the 2024 SRAs—at least in part—on information received from "third party sources" indicating that Implus was planning to "undercut[]" Bates and Hale's business. (TAC ¶¶ 93–94; *see also* ECF No. 74.3, at 13.) Implus believes that Vore is the "third party source" to which Bates and Hale's then-counsel referred. (TAC ¶ 94.)

36. Through subsequent communications with Bates and Hale's then-counsel, Implus was also informed that Bates and Hale would not be "going to work with Implus or [] Vore's company or any other competitor of Implus" and that they would instead pursue "unrelated business interests . . . as they ease into their retirement." (TAC ¶ 97; *see also* ECF No. 74.3, at 11.)

37. Despite this representation, Implus alleges, within months Bates and Hale returned to work with Blue San and have continued to solicit Implus's clients and share Implus's confidential customer information. (TAC ¶¶ 79, 86, 98, 286, 299.)

III. **Blue San's Allegations**

38. Blue San, however, paints a very different picture of the events that transpired between itself, Implus, Vore, Bates, and Hale.

39.     After being terminated by Implus in 2020, Bates and Hale continued to actively work as sales representatives for other clients in the footwear accessories and shoe care industry, while Vore accepted a position as the Chief Executive Officer for a "lifestyle products" distribution company.  (Am. Countercls. ¶¶ 7, 21.)

40.     However, in late 2023, Vore decided to join Blue San full-time as its Director of Sales, Marketing, and Operations.  (Am. Countercls. ¶¶ 7–8.)

41.     Relying on Chang, Jones, and Vore's decades of experience working at Implus, Blue San began planning to expand its business to include footwear accessories and shoe care products.  (Am. Countercls. ¶¶ 6, 9, 11–15.)

42.     Beginning in January 2024, Blue San began hearing market "chatter" that Implus was struggling to fulfill its contractual obligations with retailers in the Specialty-Family Channel segment of the market.  (Am. Countercls. ¶ 39.)

43.     Specifically, Blue San learned that Implus was experiencing delays in delivering—or had failed to deliver altogether—certain products to Specialty-Family Channel retailers, which resulted in those retailers suffering a significant amount of lost sales.  (Am. Countercls. ¶ 40.)

44.     Blue San also learned that Implus had begun marketing and selling its premium brands—which it had historically sold exclusively through Specialty-Family Channel retailers—to "big-box" retailers in the Food, Drug, and Mass Retailer Channel segment of the market, including at Walmart, CVS, Walgreens, and Costco.  (Am. Countercls. ¶¶ 41–42.)  Given the importance of brand integrity in the market, Specialty-Family Channel retailers repeatedly expressed their concerns about

Implus's "brand dilution" affecting their ability to compete with "big-box" retailers. (Am. Countercls. ¶¶ 43–44.)

45. Seeing this as an opportunity to compete with Implus, Vore—as the former executive responsible for maintaining Implus's relationships with its independent contractor sales representatives—began meeting with Bates and Hale to discuss the possibility of them working for Blue San. (Am. Countercls. ¶ 22.)

46. On or about 21 February 2024, Bates and Hale visited Blue San's office in Durham, North Carolina to review Blue San's product designs. (Am. Countercls. ¶ 25.)

47. That same day, Blue San formally offered Bates and Hale roles as independent contractor sales representatives to lead Blue San's marketing and sales efforts in the Specialty-Family Channel (the "Blue San Agreements"). (Am. Countercls. ¶ 26.) Both Bates and Hale accepted Blue San's offer. (Am. Countercls. ¶ 27.)

48. Under the terms of the Blue San Agreements, Bates and Hale were to serve "exclusively" as sales representatives for Blue San and were not to provide any services to competitors in the footwear accessories and shoe care products market. (Am. Countercls. ¶ 26.)

49. However, the parties agreed not to memorialize the terms of the Blue San Agreements in writing because they believed that their oral agreements were sufficient. (Am. Countercls. ¶ 27.)

50.     From that point forward, Bates and Hale worked on behalf of Blue San by meeting with prospective customers, previewing Blue San's anticipated product line, and engaging in weekly meetings with Blue San's leadership. (Am. Countercls. ¶¶ 28–31.)

51.     Blue San, Bates, and Hale continued to hear rumors that Implus was struggling in the market, as the representatives for various Specialty-Family Channel retailers complained of poor order fulfilment rates, late deliveries, defective products, and increasing prices. (Am. Countercls. ¶¶ 44–47.)

52.     Blue San also began receiving information that Implus's manufacturers and other vendors were becoming frustrated due to Implus's decisions to cut its orders, reduce its production volume, and its delinquency in making payments. (Am. Countercls. ¶¶ 48–50.)

53.     Vore, Chang, and Jones were also informed by some of their former colleagues who were still employed at Implus that Implus had engaged in repeated layoffs. (Am. Countercls. ¶ 51.)

54.     Further confirming Implus's financial distress, Implus's Vice President of Account Strategies, Ken Linden, allegedly told Bates and Hale that Implus had been forced to restructure its business to generate immediate short-term revenue. (Am. Countercls. ¶¶ 52–53.)

55.     Hoping to take advantage of Implus's struggling position, by June 2024 Blue San was in the advanced stages of entering the footwear accessories and shoe care products market—having developed product designs, completed sales pitch

decks, and scheduled meetings with prospective customers. (Am. Countercls. ¶¶ 36, 55.)

56. Around this same time, Implus learned of Blue San's progress. (Am. Countercls. ¶ 56.) Fearing the significant competitive threat to its Specialty-Family Channel business posed by Blue San's plans, Implus concocted a scheme to prevent, or at least delay, Blue San from entering the market. (Am. Countercls. ¶¶ 56, 63–64.)

57. The Amended Counterclaims allege that Implus's scheme first became apparent when Linden approached Bates and Hale at a Fashion Footwear Association of New York conference in New York City in June 2024. (Am. Countercls. ¶¶ 64–65.)

58. Having confirmed that Bates and Hale were working with Blue San, Implus—through Linden—offered to pay Bates and Hale between $1,000 and $1,500 per month if Bates and Hale would terminate their relationship with Blue San. (Am. Countercls. ¶¶ 65, 67.) Linden did not offer Bates and Hale employment because after their termination from Implus in 2020, Implus had transferred Bates and Hale's responsibilities to an "in-house" sales team. (Am. Countercls. ¶¶ 20, 66–67.)

59. Blue San contends that such an offer was nothing more than a "bribe[]" to prevent Bates and Hale from assisting Blue San in its efforts to compete against Implus. (Am. Countercls. ¶¶ 67, 116.)

60. Bates and Hale immediately rejected the offer, however, and Linden asked that they "give him some time" to see what other agreements Implus would authorize. (Am. Countercls. ¶¶ 67–68.)

61. Shortly thereafter, Linden—on behalf of Implus—proposed that Bates and Hale sign new contracts to serve "exclusively" as independent contractor sales representatives for Implus. (Am. Countercls. ¶¶ 68–69.) In mid-June 2024, he provided Bates and Hale with proposed copies of the 2024 SRAs. (Am. Countercls. ¶ 69.)

62. Blue San alleges that because Implus had been informed about the Blue San Agreements, Implus structured the 2024 SRAs differently than the 2012 and 2014 SRAs for the purpose of preventing Bates and Hale from continuing to work with Blue San. (Am. Countercls. ¶¶ 70–71, 73–74, 76.)

63. Implus also informed Bates and Hale that the 2024 SRAs were only being offered on the contingency that both of them accept the offer, and that if either of them refused, the offers to both would be rescinded. (Am. Countercls. ¶ 75.)

64. Eventually, both of them agreed, and on 17 June 2024 Bates and Hale—on behalf of their respective companies—entered into the 2024 SRAs with Implus. (Am. Countercls. ¶ 77.)

65. However, within forty-eight hours of signing the 2024 SRAs, Bates and Hale "realized" that they had made a mistake and provided Implus with oral and written notice that they would not adhere to the agreements. (Am. Countercls. ¶ 78.)

66.     Despite the fact that Bates and Hale never actually started working for Implus, Implus began aggressively pressuring them to comply with the restrictive covenants in the 2024 SRAs.  (Am. Countercls. ¶¶ 78–80.)  As a result of Implus's threats, Bates and Hale "cut ties" with Blue San and Vore for more than two months—during a critical time in Blue San's development.  (Am Countercls. ¶ 81.)

67.     Having (temporarily) neutralized Bates and Hale, Implus then turned its sights on threatening Vore by filing its initial Complaint in this lawsuit and asserting claims against Vore therein (the "Vore Complaint," ECF No. 3).  (Am. Countercls. ¶¶ 82–83; *see also* Vore Compl.)

68.     Blue San contends that the Vore Complaint was a pretextual "sham" that Implus has used to dissuade Vore, Chang, Jones, Bates, Hale, and Blue San's prospective customers from working with Blue San.  (Am. Countercls. ¶¶ 87–88, 92, 121.)  It contends that the Vore Complaint was designed primarily to deprive Blue San of the opportunity to compete in the market.  (Am. Countercls. ¶¶ 87, 92, 121.)

69.     Blue San alleges that in furtherance of this scheme Implus has sent document preservation letters to Chang and Jones as a means of intimidation and has made unreasonable demands on Vore, Bates, and Hale not to compete with or disparage Implus.  (Am. Countercls. ¶¶ 89–91, 93–94, 121–25; *see also* ECF Nos. 46.3, 74.3.)

70.     Blue San further asserts that the sales team at Implus has informed its customers—who are also Blue San's prospective customers—about the filing of the Vore Complaint and have made misleading and inaccurate statements suggesting

that the litigation will prevent Blue San from being able to meet its business obligations. (Am. Countercls. ¶¶ 94, 129.)

71. Most recently, in late 2024, Blue San was informed by a prospective customer in the Specialty-Family Channel segment of the market that Implus had directly informed it of the existence of this lawsuit. (Am. Countercls. ¶ 94.) As a result, the prospective customer stated that it would not be placing orders with Blue San due to its fear that Blue San would be unable to deliver its products. (Am. Countercls. ¶¶ 94, 130.)

72. Around that same time, another prospective Specialty-Family Channel retailer paused its discussions with Blue San despite having previously expressed significant interest in placing orders for Blue San's products. (Am. Countercls. ¶ 95.) Blue San likewise attributes this result to Implus's anti-competitive conduct. (Am. Countercls. ¶¶ 95, 130.)

## IV. Procedural History

73. The procedural history of this case is not for the faint of heart. Nonetheless, the Court will attempt to provide a coherent roadmap of the winding route this case has taken.

74. Implus initiated this action by filing the Vore Complaint in Wake County Superior Court on 2 July 2024.

75. This case was designated as a mandatory complex business case the same day and was subsequently assigned to the undersigned on 3 July 2024. (ECF Nos. 1–2.)

76.     On 30 August 2024, Blue San sought leave of this Court to intervene pursuant to Rules 24(a) and (b) of the North Carolina Rules of Civil Procedure. ("Motion to Intervene," ECF No. 11.)

77.     Four days later, Vore filed his initial motion to dismiss the Vore Complaint. (ECF No. 13.)

78.     However, while Vore's initial Motion to Dismiss and the Motion to Intervene were pending, Implus filed its first Amended Complaint on 21 October 2024, adding claims against Blue San. ("First Amended Complaint," ECF No. 30.) Accordingly, the Court denied the then-pending motions as moot. (ECF No. 31.)

79.     In response to the First Amended Complaint, on 20 November 2024, Blue San filed an Answer and Counterclaims against Implus ("Counterclaims," ECF No. 34), and Vore filed his second Motion to Dismiss (ECF No. 35).

80.     Implus filed its initial motion to dismiss Blue San's Counterclaims on 17 December 2024. (ECF No. 45.)

81.     After Vore's motion to dismiss the First Amended Complaint and Implus's motion to dismiss the Counterclaims had been fully briefed—but prior to the Court scheduling a hearing on the motions—on 30 January 2025, Blue San filed its Amended Counterclaims, and Implus sought leave to file the Second Amended Complaint (ECF No. 55).

82.     On 11 February 2025, the Court granted Implus leave to file the Second Amended Complaint and denied Vore and Implus's pending motions to dismiss as moot. (ECF No. 58.)

83. That same day, Implus filed the Second Amended Complaint asserting various claims for monetary relief against Vore, Blue San, H.B. Shoes Co., and The Mike Hale Company.

84. Implus subsequently filed the present Motion to Dismiss the Amended Counterclaims on 3 March 2025.

85. Defendants filed their respective Motions to Dismiss the Second Amended Complaint on 13 March 2025.

86. The Motions to Dismiss came on for a hearing before the Court on 8 May 2025 at which all parties were represented by counsel. (*See* ECF No. 94.)

87. On 16 July 2025—prior to the Court ruling on the Motions to Dismiss—Implus filed its present Motion to Amend and a copy of its proposed Third Amended Complaint.

88. The proposed Third Amended Complaint reasserts the same claims and allegations against each of the Defendants that were included in the Second Amended Complaint without any additional factual enhancement or support. (*Compare* TAC *with* SAC.)

89. The amendments in the proposed Third Amended Complaint consist of new claims Implus seeks to assert against Blue San, Vore, and four new defendants—Chang, Jones, Matthew Carter, and Sharon Fan.

90. Having been fully briefed, each of the Motions are now ripe for resolution.[3]

## LEGAL STANDARD

91. Rule 15 of the North Carolina Rules of Civil Procedure states in pertinent part as follows:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not yet been placed upon the trial calendar, he may so amend it at any time within 30 days after it is served. Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

N.C. R. Civ. P. 15(a).

92. Our Supreme Court has held that "[t]here is no more liberal canon in the [R]ules than that leave to amend shall be freely given when justice so requires." *Vaughan v. Mashburn*, 371 N.C. 428, 434 (2018) (cleaned up). "This liberal amendment process under Rule 15 complements the concept of notice pleading embodied in Rule 8 and reflects the legislature's intent that decisions be had on the merits and not avoided on the basis of mere technicalities." *Id.* (cleaned up).

93. Nevertheless, "the [R]ules still provide some protection for parties who may be prejudiced by liberal amendment." *Henry ex rel. Estate of Henry v. Deen*, 310 N.C. 75, 82 (1984) (cleaned up). "Reasons justifying denial of an amendment include: (1) undue delay, (2) bad faith, (3) undue prejudice, (4) futility of amendment, and (5)

---

[3] Pursuant to North Carolina Business Court Rule 7.4, the Court elects to rule on the Motion to Amend without a hearing. *See* BCR 7.4 (stating that "[t]he Court may rule on a motion without a hearing").

repeated failure to cure defects by previous amendments." *Howard v. IOMAXIS, LLC*, 2021 NCBC LEXIS 116, at \*17 (N.C. Super. Ct. Dec. 22, 2021) (cleaned up). "The burden is upon the opposing party to establish that [it] would be prejudiced by the amendment." *Vitaform, Inc. v. Aeroflow, Inc.*, 2021 NCBC LEXIS 79, at \*11 (N.C. Super. Ct. Sept. 16, 2021) (cleaned up).

94.     Motions to amend are "addressed to the discretion of the trial court." *Vaughan*, 371 N.C. at 433 (cleaned up).

95.     In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the complaint and "any exhibits attached to the complaint[,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), in order to determine whether "as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some recognized legal theory," *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (cleaned up). The Court must view the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (cleaned up).

96.     "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

ANALYSIS

97.     There are four motions currently before the Court.  In the first motion, Implus has requested leave to file its proposed Third Amended Complaint.  In the second motion, H.B. Shoes Co. and The Mike Hale Company have moved to dismiss all claims asserted against them in Implus's Second Amended Complaint.  In the third motion, Vore and Blue San likewise seek dismissal of all claims asserted against them by Implus in its Second Amended Complaint.  Finally, in the fourth motion, Implus seeks dismissal of Blue San's Amended Counterclaims in full.

98.     The Court will address each of the Motions in turn.

## I.     Implus's Motion to Amend

99.     As noted above, in its Motion to Amend, Implus seeks the Court's permission to file its proposed Third Amended Complaint to assert new claims against Vore, Blue San, and four additional parties.

100.    Vore and Blue San jointly oppose the Motion to Amend on the following grounds: (1) undue delay, (2) unfair prejudice and bad faith, and (3) legal futility.

### A.     Undue Delay

101.    "[A] trial court may appropriately deny a motion for leave to amend on the basis of undue delay where a party seeks to amend its pleading after a significant period of time has passed since filing the pleading and where the record or party offers no explanation for the delay." *Rabon v. Hopkins*, 208 N.C. App. 351, 354 (2010) (cleaned up).  "In deciding if there was undue delay, the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit."

*Draughon ex rel. Estate of Draughon v. Harnett Cnty. Bd. of Educ.*, 166 N.C. App. 464, 467 (2004) (cleaned up).

102.    In arguing that Implus has unduly delayed in bringing the Motion to Amend, Vore and Blue San point to the fact that the Vore Complaint was filed on 2 July 2024—more than twelve months prior to the Motion to Amend—and that the Court's original Case Management Order (ECF No. 28) set 30 January 2025 as the deadline for the parties to file any motions to amend the pleadings or add parties.

103.    In response, Implus asserts that the alleged conduct that forms the bases for each of the new claims in the proposed Third Amended Complaint was only discovered recently—through a review of rolling document productions, which were produced by Blue San in May 2025 pursuant to Implus's discovery requests.  Implus further asserts that key documents relevant to the allegations in the proposed Third Amended Complaint were designated by Blue San as "highly confidential—attorneys' eyes only," meaning that Implus's counsel could not share those documents with Implus until the parties agreed to amend their original consent protective order with regard to that subject.  (*See* ECF Nos. 32–33, 108–09.)

104.    Vore and Blue San dispute Implus's assertions and insist that Implus would have discovered the alleged conduct much sooner if it had been more diligent in conducting an internal review of its own documents.

105.    This Court addressed similar arguments in *United Therapeutics Corp. v. Liquidia Technologies, Inc.* and stated as follows:

> UTC seeks to add allegations regarding misappropriated trade secrets that it contends it discovered by reviewing Liquidia's document

production in this case. UTC argues that documents Liquidia produced in February 2023 reveal that Roscigno took more trade secrets than UTC originally believed. It proposes to amend its complaint to reflect this discovery.

Defendants oppose the amendments and maintain that UTC has been in possession of the documents on which it now relies since May 2021, when the same documents were produced in earlier litigation. They argue that the proposed amendments would result in additional discovery, prolong the case, and increase the risk of damage to Dr. Roscigno's reputation. Thus, Defendants argue that the amendments should be denied on grounds of both undue delay and undue prejudice.

Even if the documents on which UTC relies were included among the thousands produced in earlier litigation, a protective order entered in the earlier case created uncertainty about UTC's ability to use those documents in this litigation. Moreover, until they were produced in the case sub judice, UTC's counsel did not know of their existence. After they became aware of the documents as a result of reviewing the February 2023 document production, UTC moved promptly to amend. Further, the proposed amendments to the misappropriation of trade secrets cause of action do not fundamentally change the nature of the claims against Defendants.

2023 NCBC LEXIS 88, at \*9–10 (N.C. Super. Ct. July 20, 2023) (cleaned up).

106. Furthermore, the unique procedural posture of this case must be taken into account. While it is true that this case has been ongoing for more than fourteen months, the Court notes that (1) new claims, factual allegations, and parties were added as recently as 11 February 2025; (2) *none* of the Defendants have yet filed answers to the Second Amended Complaint; and (3) fact discovery is currently ongoing.

107. Having carefully considered the record and the parties' competing arguments, the Court is satisfied that Implus has not unduly delayed filing its Motion to Amend.

### B. Unfair Prejudice and Bad Faith

108. "[I]t is not uncommon for a proposed amendment to impact the status quo in a way that the nonmovant opposes. But not every impact constitutes undue prejudice." *Howard v. IOMAXIS, LLC*, 2023 NCBC LEXIS 159, at *14 (N.C. Super. Ct. Nov. 29, 2023). A motion for leave to amend "should be freely allowed unless some *material prejudice* to the other party is demonstrated." *Vaughan*, 371 N.C. at 433 (emphasis added) (cleaned up). "[U]ndue prejudice is not presumed, even when the proposed amendments are extensive." *Howard*, 2023 NCBC LEXIS 159, at *14.

109. "[B]ad faith amendments are those which may be abusive or made in order to secure some ulterior tactical advantage." *Columbus Life Ins. v. Wells Fargo Bank, N.A.*, 2022 NCBC LEXIS 40, at *11 (N.C. Super. Ct. May 3, 2022) (cleaned up).

110. Vore and Blue San contend that the Motion to Amend has been brought in bad faith and that they will be unfairly prejudiced if Implus is allowed to amend its pleading. Specifically, Vore and Blue San argue that (1) Implus acted in bad faith by not informing Vore and Blue San of its intention to file the Motion to Amend prior to the depositions of Implus's witnesses; (2) the allegations and claims in the proposed Third Amended Complaint would require them to "build an entirely new defense beyond the one already developed"; and (3) joining new parties and additional claims would "move the parties back to day one" for purposes of discovery.

111. However, nothing in the record supports Vore and Blue San's assertion that Implus deceptively withheld its plan to file the Motion to Amend.

112. Likewise, Vore and Blue San have failed to make a persuasive showing that the new claims contained in the proposed Third Amended Complaint would require Vore or Blue San to abandon their current defense of the case. In each of its successive pleadings, Implus's overarching theory in this litigation has been premised on the belief that its former employees have engaged in unlawful conduct in order to help Blue San unfairly compete against Implus in the relevant market. Implus's claims in the proposed Third Amended Complaint—though perhaps more expansive than its claims in its prior pleadings—continue to advance that theory. *See Trail Creek Invs. LLC v. Warren Oil Holding Co.*, 2023 NCBC LEXIS 128, at *8 (N.C. Super. Ct. Oct. 13, 2023) (concluding that a proposed amended complaint did not raise "a new theory[,]" requiring a new defense, when similar "fraud was alleged by [plaintiff] in its original [c]omplaint").

113. Furthermore, to the extent that Vore and Blue San express concern regarding the potential impact to discovery in this case, they do not explain *how* they will be prejudiced by any additional discovery that will be necessary to investigate Implus's allegations in the proposed Third Amended Complaint.[4] In any event, our appellate courts have held that "[t]he fact that additional discovery may be required or that additional counsel may be required to represent [a] new defendant does not amount to prejudice[.]" *Coffey v. Coffey*, 94 N.C. App. 717, 723 (1989); *see also*

---

[4] In considering Vore and Blue San's argument regarding the potential delay that might result from any additional discovery, the Court notes that Vore and Blue San have—either jointly with Implus or on their own—requested that the Court extend various discovery deadlines in this case on three different occasions, including as recently as 27 June 2025. (*See* ECF Nos. 61, 97, 104.)

*Vitaform, Inc.*, 2021 NCBC LEXIS 79, at *17 (noting that "permit[ting] additional fact discovery . . . [will] alleviate any potential prejudice caused by the timing of [d]efendants' amendment").

114. As such, Vore and Blue San have failed to demonstrate that they are likely to suffer material prejudice if Implus is granted leave to file the proposed Third Amended Complaint.

## C. Legal Futility

115. "The futility standard under Rule 15 is essentially the same standard used in reviewing a motion to dismiss under Rule 12(b)(6), but provides the Court liberal discretion to find that an amendment lacks futility." *Simply the Best Movers, LLC v. Marrins' Moving Sys., Ltd.*, 2016 NCBC LEXIS 28, at *5–6 (N.C. Super. Ct. Apr. 6, 2016) (cleaned up). "[A] motion to amend is not futile when the allegations of the amendment, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Howard*, 2023 NCBC LEXIS 159, at *15 (cleaned up). On the other hand, "[a] motion for leave to amend is futile and appropriately denied when the proposed amendment could not withstand a motion to dismiss for failure to state a claim." *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2016 NCBC LEXIS 77, at *6 (N.C. Super. Ct. Oct. 7, 2016) (cleaned up).

116. With respect to legal futility, Vore and Blue San argue that the Motion to Amend should be denied because the claims Implus seeks to add in the proposed Third Amended Complaint are insufficiently pled. In support of this argument, Vore

and Blue San repeat many of the same arguments made in support of their Motion to Dismiss Implus's claims in the Second Amended Complaint. As is apparent from the Court's lengthy analysis contained below with regard to the existing Motions to Dismiss, however, such arguments require a detailed analysis of the specific factual allegations made in support of each claim.

117. Based on the limited briefing the parties have submitted on this issue, the Court is unable to say at the present time that allowing Implus's new claims would be legally futile. *See Truist Fin. Corp. v. Rocco*, 2023 NCBC LEXIS 117, at *4 (N.C. Super. Ct. Sept. 20, 2023) (concluding that "the fair and impartial administration of justice and the interests of judicial efficiency and economy would be best served . . . by granting the [m]otion to [a]mend, without prejudice to [d]efendants' rights to seek dismissal of the [f]irst [a]mended [c]omplaint under Rule 12"); *Hopkins v. MWR Mgmt. Co.*, 2015 NCBC LEXIS 104, at *22 (N.C. Super. Ct. Nov. 5, 2015) ("The [c]ourt is therefore not prepared to consider the proposed claims as futile . . . and believes that their legal sufficiency is more properly tested through later motions practice after amendment with appropriate briefing and argument"); *Deluca v. River Bluff Holdings II, LLC*, 2015 NCBC LEXIS 12, at *9 (N.C. Super. Ct. Jan. 28, 2015) (noting that "[t]he [c]ourt may, but is not required to, deny [p]laintiffs' [m]otion to [a]mend based on futility" and preferring to "evaluate [the proposed amendments'] validity" through a motion to dismiss).

### D. Judicial Economy

118. Finally, the Court is satisfied that the interests of judicial economy would be furthered by allowing Implus to add these new claims in the present case as opposed to forcing Implus to assert them in a brand new lawsuit. To be sure, the newly asserted claims and supporting factual allegations in the proposed Third Amended Complaint go well beyond the relatively narrow scope of the shareholder dispute first described in the Vore Complaint. However, those limited issues have not been the primary focus of this litigation for nearly a year.

119. Since at least October 2024—through subsequent pleadings, the joinder of new parties, and the assertion of counterclaims—this case has expanded to reflect an ongoing and contentious dispute touching numerous aspects of Implus and Blue San's competitive operations.

120. Given the overwhelming overlap in background facts, witnesses, evidence, and subject matter, the Court sees little to be gained in forcing Implus to file a separate lawsuit to assert the new claims contained in the proposed Third Amended Complaint. *See Rfactr, Inc. v. McDowell*, 2024 NCBC LEXIS 94, at *12 (N.C. Super. Ct. July 18, 2024) (granting a motion to amend and noting that "permitting the two defamation claims—each arising from the same fire—to be tried in the same action would promote judicial economy" (cleaned up)); *see also Webster Enters., Inc. v. Selective Ins. Co. of the Se.*, 125 N.C. App. 36, 46 (1997) (holding that requiring separate trials for claims "aris[ing] from an interrelated nucleus of facts" is "irreconcilable with the overriding interests of judicial economy").

121.   Having painstakingly reviewed and considered each of the parties' arguments—including the allegations of finger-pointing and lack of cooperation among counsel expressed by both sides—the Court concludes that the Motion to Amend should be **GRANTED**.[5]

122.   Because the Court is granting the Motion to Amend, that would ordinarily moot the existing motions to dismiss that have been raised by Vore, Blue San, H.B. Shoes Co., and The Mike Hale Company with regard to claims asserted in Implus's Second Amended Complaint—meaning that Defendants would have to file new motions to dismiss those claims (which would, in turn, require new briefing).

123.   However, such a result would be inimical to notions of judicial economy and would require the expenditure of significant attorneys' fees by the parties and consume considerable resources of the Court.   The proposed Third Amended Complaint does not assert any new material allegations relevant to any of the claims asserted in the Second Amended Complaint.

124.   Indeed, this Court was faced with similar circumstances in *Stamatakos v. Carolina Urology Partners, PLLC* and stated as follows:

> The parties have fully briefed and argued the issues upon which Defendants' Partial Motion to Dismiss is based.  Moreover, as noted above, the SAC contains no new allegations relevant to Plaintiff's UDTP claim, meaning that the arguments made by Defendants in the Partial Motion to Dismiss as to the UDTP claim (and by Plaintiff in his response brief) are unaffected by the Motion to Amend. . . .

---

[5] However, the Court takes this opportunity to remind counsel of their ethical duty to litigate this case in accordance with the principles of collegiality contemplated by the North Carolina Rules of Professional Conduct.  *See, e.g.,* N.C. R. Prof. Conduct 0.1(m) ("Although a matter is hotly contested by the parties, a lawyer should treat opposing counsel with courtesy and respect.").

Therefore, the Court, in the exercise of its discretion and its inherent authority to control its docket in furtherance of judicial economy, will proceed to address all of the arguments raised in both Motions. *See Gateway Mgmt. Servs., Ltd. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC LEXIS 45, at *8 (N.C. Super. Ct. May 9, 2018) ("Although an amended pleading would ordinarily moot a pending motion to dismiss, the Court will consider Defendants' Motions to Dismiss as to the Amended Complaint because Defendants and Plaintiff both addressed the sufficiency of the Amended Complaint in their respective briefs and at the hearing.").

2024 NCBC LEXIS 28, at *24–25 (N.C. Super. Ct. Feb. 20, 2024).

125. Accordingly, the Court will now address each of the Motions to Dismiss in turn.

## II. H.B. Shoes Co. and The Mike Hale Company's Motion to Dismiss

126. Implus has brought claims against H.B. Shoes Co. and The Mike Hale Company for breach of contract (alleging various breaches of the 2012, 2014, and 2024 SRAs) along with a claim for unfair and deceptive trade practices ("UDTP").

### A. Breach of Contract

127. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. The elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Davis v. Woods*, 286 N.C. App. 547, 561 (2022) (cleaned up).

128. As an initial matter, the parties agree that the substantive terms of the provisions at issue in the 2012 and 2024 SRAs between Implus and H.B. Shoes Co. are substantively identical to those provisions at issue in the 2014 and 2024 SRAs between Implus and The Mike Hale Company.

129. As such, the Court will consider the breach of contract claims against both of these Defendants together.

**1. Breach of the 2012 and 2014 SRAs**

130. Implus's first theory of breach of contract is that Bates and Hale violated the terms of the confidentiality provisions contained in the 2012 SRA (between Implus and H.B. Shoes Co.) and the 2014 SRA (between Implus and The Mike Hale Company).

131. Specifically, Implus alleges that

[o]ver the years, because of H.B. Shoes'[s] contracts with Implus and on behalf of H.B. Shoes, Hugh Bates received confidential Implus brand overview reports from Customer 1 via email. Bates mistakenly continued receiving these reports directly from Customer 1 after his termination from Implus.

These reports H.B. Shoes received from Customer 1 contained, *inter alia*, data regarding units of individual Implus products sold enumerated by department, style name, and color; product pricing, including sticker price and average price; and margins.

The bottom of each Customer 1 report was labeled "[Customer 1] Proprietary Information - If you receive this email attachment by mistake, please destroy it immediately."

Upon information and belief based on discovery collected from third-party subpoena to H.B. Shoes in December 2024 and January 2025, Hugh Bates, on behalf of H.B. Shoes, forwarded the Implus/Customer 1 confidential reports at a minimum to Blue San's Todd Vore, Matt Carter, Rich Chang, and Merrick Jones in February 2024, and again to Matt Carter and Todd Vore in March, June, and September 2024.

. . .

Blue San's Matt Carter (formerly Vice President of International Sales at Implus and who worked at Implus from roughly 2002 to 2020) specifically asked Hugh Bates to forward the Customer 1/Implus confidential information to Blue San, thanked Bates upon receipt of the data several times, and met with Bates to discuss Customer 1.

. . .

Upon information and belief based on discovery collected from third-party subpoena to The Mike Hale Company in December 2024 and January 2025, The Mike Hale Company also engaged in similar activity as H.B. Shoes. Over the years, as a result of The Mike Hale Company's contracts with Implus and on behalf of The Mike Hale Company, Mike Hale received confidential Implus Sof Sole brand overview reports relating to Customer 2 via email. Hale mistakenly continued receiving these reports directly from Customer 2 after his termination from Implus.

The Sof Sole brand overview reports Hale received from Customer 2 contained confidential Implus sales and product information, including product breakdowns by store number, cost, color, design, and inventory.

Upon information and belief based on discovery collected from third-party subpoena to The Mike Hale Company in December 2024 and January 2025, Blue San's Matt Carter asked Mike Hale, on behalf of The Mike Hale Company, to forward those confidential Implus Sof Sole/Customer 2 reports to Blue San several times. Hale complied, at a minimum, twice in March 2024 and once in April 2024.

Upon information and belief based on discovery collected from third-party subpoenas to H.B. Shoes and The Mike Hale Company in December 2024 and January 2025, Bates and Hale also orally discussed the confidential Implus/Customer 1 and Implus Sof Sole/Customer 2 reports with Blue San on behalf of H.B. Shoes and The Mike Hale Company.

(TAC ¶¶ 75–78, 80, 82–85.)

132. As noted above, the confidentiality provisions in the 2012 and 2014 SRAs are identical and state as follows:

Disclosure of Confidential Information. Representative acknowledges that by reason of this Agreement it will receive proprietary and confidential information ("Trade Secrets") related to Implus and its business. It acknowledges that Implus's Trade Secrets, including but not limited to those related to Product development, manufacturing techniques, sales activities, promotion and pricing techniques, Customer List and financial information and requirements concerning customers and suppliers, but excluding information publicly available, are valuable assets of Implus, and have been and will continue to be

instrumental in Implus's growth and business success. In recognition of this fact, Representative agrees that it will not, from and after the date hereof, disclose any Trade Secrets to any Person, or make use of such Trade Secrets for the benefit of itself or any other Person, other than Implus.

(ECF No. 59.3 at 4; ECF No. 59.4 at 4.)

133. Implus contends that the brand overview reports that Bates and Hale mistakenly received following their termination from Implus in 2020 are subject to the confidentiality restrictions in the 2012 and 2014 SRAs. Therefore, Implus argues that Bates and Hale breached their agreements by sharing—and discussing—the contents of those reports with Blue San.

134. Bates and Hale's sole argument for dismissal of these claims is that any claims arising under the 2012 and 2014 SRAs were extinguished upon the parties entering into the 2024 SRAs. Specifically, Bates and Hale contend that the language of Section 14 of the 2024 SRAs effectively novated their prior agreements with Implus.

135. Section 14 states as follows:

Entire Agreement. The terms and conditions of this Agreement supersede any and all previous agreements between the parties, whether oral or written. This instrument contains the entire agreement between the parties relating to the subject matter hereof and may not be changed orally but only by agreement in writing signed by the parties.

(ECF No. 74.2, at 5, 15.)

136. A novation is the "substitution of a new contract or obligation for an old one which is thereby extinguished[.]" *Bowles v. BCJ Trucking Servs., Inc.*, 172 N.C. App. 149, 154 (2005) (cleaned up). "The essential requisites of a novation are a

previous valid obligation, the agreement of all the parties to the new contract, the extinguishment of the old contract, and the validity of the new contract." *Anthony Marano Co. v. Jones*, 165 N.C. App. 266, 269 (2004) (cleaned up). "Whether a new contract between the same parties discharges or supersedes a prior agreement depends upon their intention as ascertained from the instrument, the relation of the parties[,] and the surrounding circumstances." *Zinn v. Walker*, 87 N.C. App. 325, 335 (1984) (cleaned up), *disc. rev. denied*, 321 N.C. 747 (1988). "The intention of the parties to effectuate a novation must be clear and definite," *Kirby Bldg. Sys., Inc. v. McNiel*, 327 N.C. 234, 243 (1990) (cleaned up), and must be proven by "clear and convincing evidence," *Zinn*, 87 N.C. App. at 336–37 (cleaned up).

137. Bates and Hale assert that the phrase "supersede[s] any and all previous agreements" is clear and unambiguous language reflecting the parties' intent to substitute the 2012 and 2014 SRAs with the 2024 SRAs—thus extinguishing any of Implus's claims under the prior agreements. In support of their argument, Bates and Hale primarily rely on our Supreme Court's decision in *Intersal, Inc. v. Hamilton*. 373 N.C. 89 (2019).

138. In *Intersal*, our Supreme Court affirmed this Court's conclusion that the parties—by entering into a settlement agreement—had intended to novate the parties' prior contract and stated the following regarding that issue:

> The words of the 2013 Settlement Agreement themselves "make it clear . . . the second contract supersedes the first." *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 526 (1989). Specifically, the 2013 Settlement Agreement states that it "supersedes the 1998 Agreement, *attached as Attachment A*, and all prior agreements between D[N]CR, [plaintiff], and Nautilus regarding the *QAR* project." (emphases added). Because

the language of the 2013 Settlement Agreement so clearly demonstrates the parties' intent that it would function as a novation of the 1998 Agreement, our analysis can end with the plain wording of the agreement. *See Whittaker Gen. Med. Corp.*, 324 N.C. at 526 (stating that a court will look to the circumstances surrounding the second agreement to determine whether it is a novation "*if the words [of the agreement] do not make it clear*" (emphasis added))[].

Because the 2013 Settlement Agreement was a novation of the 1998 Agreement, plaintiff's breach of contract claims arising from the 1998 Agreement are "extinguished." *See Carolina Equip. & Parts Co. v. Anders*, 265 N.C. 393, 400 (1965) (citing *Tomberlin v. Long*, 250 N.C. 640, 644 (1959)).

373 N.C. at 99.

139. Here, however, the language of Section 14 is distinguishable from the language at issue in *Intersal* such that the Court cannot conclude from the "plain wording" of Section 14 alone that the parties intended the 2024 SRAs to substitute the 2012 and 2014 SRAs.

140. First, in *Intersal*, the operative language in the subsequent agreement specifically referenced the parties' prior agreement and even attached it as an exhibit. Here, however, neither Section 14—nor any other provision of the 2024 SRAs—explicitly quotes, references, cites, incorporates by reference, or attaches the 2012 or 2014 SRAs. *See Diverse Networks v. Time Warner Ent.-Advance/Newhouse P'ship*, 2012 NCBC LEXIS 3, at *4, *10 (N.C. Super. Ct. Jan. 9, 2012) (concluding that a contractual provision stating that the contract "supersedes any and all other [a]greements, either oral or in writing between the parties hereto with respect to the subject matter hereof" did not create a novation where the disputed provision did not specifically reference the prior agreement); *see also Whittaker Gen. Med. Corp.*, 324 N.C. at 527 (concluding that "[t]he jury could have found it was not the intent of the

parties to abrogate the first contract" where the subsequent contract did not explicitly "mention the . . . first contract").

141. Second, whereas the subsequent agreement in *Intersal* included a broad release of claims, the 2024 SRAs do not purport to release any of the parties' existing claims. *See Intersal, Inc. v. Hamilton*, 2017 NCBC LEXIS 97, at *17 (N.C. Super. Ct. Oct. 12, 2017) (noting that "[t]he 2013 Settlement Agreement also contains a broad release of [p]laintiff's claims under the 1998 Agreement"), *aff'd in relevant part*, 373 N.C. at 98–100. To the contrary, the 2012 and 2014 SRAs each contain a "Survival" clause, which expressly states that Bates and Hale's confidentiality obligations survive the expiration or termination of those agreements. (ECF No. 59.3, at 7; ECF No. 59.4, at 7; *see also Alkemal Sing. PTE Ltd. v. DEW Glob. Fin., LLC*, 2017 NCBC LEXIS 112, at *43 (N.C. Super. Ct. Dec. 12, 2017) (concluding that "conflicting evidence as to whether the parties intended to remain bound by the [prior agreement] or intended the transaction to be governed by the [subsequent agreements] creates a genuine issue of material fact that requires jury determination").

142. Third, unlike the "clear intent" apparent in *Intersal*, the second sentence of Section 14 indicates that the parties may have intended only to supersede prior oral or written agreements concerning the 2024 SRAs—but not any other unrelated agreement. *See Pa. Nat'l Mut. Ins. v. Strickland*, 178 N.C. App. 547, 550 (2006) (noting that contractual provisions "must be interpreted in view of the whole contract and not in isolation" (cleaned up)). Specifically, Section 14 provides that the 2024 SRAs are "entire agreement[s] between the parties *relating to the subject matter*

*hereof*[.]" (ECF No. 74.2, at 5, 15 (emphasis added).) Because the confidentiality provisions of the 2012, 2014, and 2024 SRAs each apply to different information—based on when the information was shared—as opposed to applying to all confidential information ever shared, the confidentiality provisions of the 2012, 2014, and 2024 SRAs do not concern the same subject matter.

143. For these reasons, the Court believes that the parties' arguments as to their intentions are premature and that the Court would benefit from a more fully developed factual record on this issue. *See Oliver v. Brown & Morrison, Ltd.*, 2022 NCBC LEXIS 20, at *17 (N.C. Super. Ct. Mar. 3, 2022) (denying a motion to dismiss where "it [was] not clear to the [c]ourt based on the facts alleged in the [c]omplaint, as opposed to any position argued by [d]efendants[] . . . that there was an intent by all the parties . . . that the second contract [] be substituted for the original contract").

144. Based solely on the record properly before the Court at this early stage of the litigation, the Court cannot conclude that the language of Section 14 establishes an unambiguous intention of the parties to extinguish their rights and obligations under the 2012 and 2014 SRAs.

145. It is true that "a merger clause in a second contract may cause a novation[.]" *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 654 (2009). However, any presumption created by the existence of a merger clause can be rebutted through evidence of the "existence of fraud, bad faith, unconscionability, negligent omission[,] or mistake in fact." *Zinn*, 87 N.C. App. at 333 (cleaned up).

146. Implus alleges that—unbeknownst to it—Bates and Hale (1) continued to receive Implus's confidential customer information following their termination in 2020; (2) shared that information with Blue San; and (3) entered into the 2024 SRAs without disclosing their conduct or contractual relationship with Blue San. Such allegations, if proven true, may be sufficient to rebut any presumptive effect based on the merger clause in Section 14.

147. Given the "relatively low bar" of notice pleading, the Court is satisfied that Implus has alleged sufficient facts to sustain its claims for breach of the 2012 and 2014 SRAs. *See, e.g., LFF IV Timber Holding LLC v. Heartwood Forestland Fund IV, LLC*, 2024 NCBC LEXIS 119, at *18 (N.C. Super. Ct. Sept. 6, 2024) (noting that "[a]lthough [plaintiff] will, of course, have to make a more detailed showing at later stages of this litigation, . . . its allegations are sufficient to pass muster under" the "relatively low bar" of notice pleading for claims of breach of contract (cleaned up)).

148. Therefore, H.B. Shoes Co. and The Mike Hale Company's Motion to Dismiss Implus's claims for breach of Section 11 of the 2012 and 2014 SRAs is **DENIED**.

### 2. Breach of the 2024 SRAs

149. With respect to Implus's second theory of breach of contract—alleging breaches of various terms of the 2024 SRAs—H.B. Shoes Co. and The Mike Hale Company concede that they are not seeking dismissal of these claims with respect to their alleged breaches of Section 4 (Services Provision), Section 5 (Warranty Provision), or Section 11 (Term Provision).

150.	Instead, they are only seeking dismissal of these claims to the extent that Implus has alleged breaches of Section 9 (Non-Solicitation Provision) and Section 10 (Confidentiality Provision).

**(a)	Section 9 (Non-Solicitation Provision)**

151.	With regard to the Non-Solicitation Provision, Implus has clarified that it is not alleging breaches of Sections 9(b) or (c) and is instead solely alleging a breach of Section 9(a).

152.	Specifically, Implus alleges that Bates and Hale have breached the terms of Section 9(a) by "attempt[ing] to solicit Implus's customers on behalf of Blue San[.]" (TAC ¶ 86; *see also* TAC ¶¶ 81, 286, 299.)

153.	Section 9 states in relevant part as follows:

> Representative further agrees, in order to preserve the goodwill and ongoing business value of Implus, that during the term of this Agreement and for a period of six (6) months after the date of termination or expiration of this Agreement for any reason, Representative will not, directly or indirectly, (a) attempt to divert or take away any past or present Customers or solicit or hire any past or present employee of Implus . . . .

(ECF No. 74.2, at 3, 13.)

154.	In response, Bates and Hale assert that Section 9(a) is overly broad and unenforceable because it prohibits the solicitation of Implus's "past" employees, including those with whom Bates and Hale never had contact.

155.	This Court has previously stated the following with regard to the enforceability of non-solicitation agreements:

> "Courts in North Carolina have recognized that reasonable restrictions on a former employee's right to solicit an employer's current employees are enforceable[,]" as such provisions are simply "another means of

protecting the former employer's interest in the good-will it has with its customers." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 2018 NCBC LEXIS 42, at \*26–28 (N.C. Super. Ct. May 8, 2018), *aff'd*, 372 N.C. 260 (2019); *see also Jeffrey R. Kennedy, D.D.S., P.A. v. Kennedy*, 160 N.C. App. 1, 11 (2003) ("[T]he covenant prohibiting [defendant] from soliciting and hiring plaintiff's former employees for the three-year period does not violate public policy.")[.] Nevertheless, "[a] restriction on solicitation of employees generally is subject to the same requirements as other restrictive covenants." *Wells Fargo Ins. Servs. USA, Inc.*, 2018 NCBC LEXIS 42, at \*27. Thus, "[t]o establish that a non-solicitation of employees covenant is reasonable, an employer must establish that it has a protectable business interest in prohibiting solicitation of former employees, and such prohibition must be no broader than necessary to protect that interest." *Id.*, at \*28; *see, e.g., Med. Staffing Network, Inc.*, 194 N.C. App. at 657 (holding unenforceable a prohibition on defendant's solicitation of employees of plaintiff's affiliate for which defendant did not work).

*Bite Busters, LLC v. Burris*, 2021 NCBC LEXIS 26, at \*15–16 (N.C. Super. Ct. Mar. 25, 2021).

156. At the 8 May hearing, counsel for Implus conceded that—as written—Section 9(a) is overly broad because Implus has no legitimate business interest in prohibiting Bates and Hale from soliciting Implus's past employees. (Tr., at 130.)

157. Instead, Implus's counsel argued that the deficiencies in Section 9(a) can be remedied through "blue penciling" in order to remove the phrase "any past" that immediately precedes the words "employee of Implus[.]" (Tr., at 129–30.) However, Implus failed to request that the Court exercise its blue penciling authority in its briefs in connection with the Motions to Dismiss.[6] (Tr., at 129–30.) As such, the

---

[6] The Court will not consider arguments on a motion that are raised for the first time at a hearing and were not briefed. *See Charles Schwab & Co. v. Marilley*, 2024 NCBC LEXIS 27, at \*16 n.4 (N.C. Super. Ct. Feb. 20, 2024), (refusing to consider an argument that "was not briefed, and therefore inappropriately raised for the first time in oral argument"), *aff'd per curiam*, 387 N.C. 185 (2025).

Court, in the exercise of its discretion, declines Implus's late invitation to blue pencil the unreasonable portions of Section 9(a). *See, e.g., Elior, Inc. v. Thomas*, 2024 NCBC LEXIS 61, at *36 (N.C. Super. Ct. Apr. 22, 2024) (noting that "[u]ltimately, application of the blue pencil doctrine is within the discretion of the [c]ourt" (cleaned up)).

158. Therefore, because Section 9(a) is unenforceable on this basis alone, the Court need not consider the parties' remaining arguments as to this claim.

159. Accordingly, H.B. Shoes Co. and The Mike Hale Company's Motion to Dismiss Implus's claims for breach of Section 9 of the 2024 SRAs is **GRANTED**, and these claims are **DISMISSED** with prejudice.

### (b)     Section 10 (Confidentiality Provision)

160. As for Implus's claims for breach of Section 10, Implus alleges that Bates and Hale—on behalf of H.B. Shoes Co. and The Mike Hale Company—have breached the confidentiality provisions of the 2024 SRAs by sharing and discussing Implus's confidential customer information with Blue San and its employees.

161. Section 10 states as follows:

Disclosure of Confidential Information. Representative acknowledges that by reason of this Agreement it will receive proprietary and confidential information ("Trade Secrets") related to Implus and its business. It acknowledges that Implus's Trade Secrets, including but not limited to those related to Product development, manufacturing techniques, sales activities, promotion and pricing techniques, Customer List and financial information and requirements concerning customers and suppliers, but excluding information publicly available, are valuable assets of Implus, and have been and will continue to be instrumental in Implus's growth and business success. In recognition of this fact, Representative agrees that it will not, from and after the date hereof, disclose any Trade Secrets to any Person, or make use of such

Trade Secrets for the benefit of itself or any other Person, other than Implus.

(ECF No. 74.2, at 4, 13.)

162. Bates and Hale first assert that Section 10 is overly broad and unenforceable because it limits the disclosure of non-protectable information, such as basic customer contact information. However, this argument fails for two reasons.

163. First, it overlooks the plain language of Section 10, which expressly "exclud[es] information publicly available[.]" (ECF No. 74.2, at 4, 13.)

164. Second, this Court has previously held that an overinclusive confidentiality agreement is nonetheless enforceable to the extent that it protects truly confidential information. *See Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at *24–27 (N.C. Super. Ct. Oct. 15, 2015) (finding that although a confidentiality agreement was unenforceable to the extent that it restricted the disclosure of information that was "not confidential in any meaningful sense[,]" it was enforceable as to truly confidential information, including "customer credit information, gas usage patterns, and pricing and marketing information"); *see also Rel. Ins. v. Pilot Risk Mgmt. Consulting, LLC*, 2024 NCBC LEXIS 99, at *98 (N.C. Super. Ct. July 12, 2024) (finding that lengthy confidentiality provisions were "intended to protect [plaintiff's] confidential business information as opposed to being restrictive covenants in disguise").

165. Bates and Hale next argue that the information and documents they are alleged to have disclosed are not within the scope of information subject to the 2024 SRAs' confidentiality provisions. Specifically, they assert that the information

allegedly shared with Blue San was (1) not proprietary to Implus; (2) not treated as confidential by Implus's clients; and (3) shared by mistake—not "by reason" of the 2024 SRAs.

166. However, the proposed Third Amended Complaint alleges that

[i]mmediately after H.B. Shoes and The Mike Hale Company executed the 2024 Sales Representative Agreement[s], Implus began giving Bates and Hale specific information about the customers listed in their 2024 Sales Representative Agreements, which included Customer 1 and Customer 2. This includes, for example, an email on June 18—they [*sic*] day before the Sales Representatives repudiated their agreements with Implus—where Implus copied Hale on several emails containing its confidential strategic deck for Customer 2.

. . .

Upon information and belief based on document productions from Bates and Hale in December 2024 and January 2025, Vore and Blue San conspired with Bates and Hale to misappropriate Implus's confidential, proprietary, and trade secret information to compete with Implus. Blue San knowingly acquired confidential Implus sales and product information by requesting Bates and Hale, on behalf of H.B. Shoes and The Mike Hale Company, to send that information to Blue San, in violation of the confidentiality provisions in H.B. Shoes' 2012 and 2024 Sales Agreements and in violation of The Mike Hale Company's 2014 and 2024 Sales Agreements.

. . .

Upon information and belief based on discovery collected from third-party subpoena to H.B. Shoes in December 2024 and January 2025, Bates continued to send the Implus/Customer 1 confidential reports to Blue San even after the July 11, 2024 representation to Implus that Bates was no longer working in the industry (including for Blue San or Vore) and after Implus gave Bates information about Customer 1 pursuant to the June 2024 sales representative agreement he repudiated on behalf of H.B. Shoes.

Blue San's Matt Carter (formerly Vice President of International Sales at Implus and who worked at Implus from roughly 2002 to 2020) specifically asked Hugh Bates to forward the Customer 1/Implus

confidential information to Blue San, thanked Bates upon receipt of the data several times, and met with Bates to discuss Customer 1.

. . .

Upon information and belief based on discovery collected from third-party subpoena to The Mike Hale Company in December 2024 and January 2025, Blue San's Matt Carter asked Mike Hale, on behalf of The Mike Hale Company, to forward those confidential Implus Sof Sole/Customer 2 reports to Blue San several times. Hale complied, at a minimum, twice in March 2024 and once in April 2024.

Upon information and belief based on discovery collected from third-party subpoenas to H.B. Shoes and The Mike Hale Company in December 2024 and January 2025, Bates and Hale also orally discussed the confidential Implus/Customer 1 and Implus Sof Sole/Customer 2 reports with Blue San on behalf of H.B. Shoes and The Mike Hale Company.

Based on discovery obtained in the same third-party subpoenas, H.B. Shoes and The Mike Hale Company have also been working with Blue San following their repudiation of the 2024 Sales Representative Agreements in June 2024 and have attempted to solicit Implus's customers on behalf of Blue San, including Customer 1 and Customer 2.

(TAC ¶¶ 71, 74, 79–80, 84–86.)

167. These allegations can be fairly read as alleging that at least some of the information that is the subject of Implus's claims for breach of Section 10 is proprietary and confidential to Implus and was purposefully shared with Bates and Hale pursuant to the 2024 SRAs.

168. To the extent that Bates and Hale are contending that more detailed allegations are required to demonstrate the proprietary and confidential nature of such information, claims for breach of contract are not held to a heightened pleading standard. *See, e.g., AYM Techs., LLC v. Rodgers*, 2018 NCBC LEXIS 14, at *52–53 (N.C. Super. Ct. Feb. 9, 2018) (noting that "a claim for breach of contract is not subject

to heightened pleading standards, and instead, . . . must merely give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief") (cleaned up).

169. At this stage of the litigation, Implus has pled sufficient facts to state a valid claim for breach of Section 10 of the 2024 SRAs. *See LFF IV Timber Holding LLC*, 2024 NCBC LEXIS 119, at *18.

170. Accordingly, H.B. Shoes Co. and The Mike Hale Company's Motion to Dismiss this claim is **DENIED**.

**B. UDTP**

171. To establish a prima facie claim for UDTP, a plaintiff must show: "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Gen. Fid. Ins. v. WFT, Inc.*, 269 N.C. App. 181, 191 (2020) (cleaned up).

172. North Carolina courts have repeatedly held that "[a]ctions for [UDTP] are distinct from actions for breach of contract, and a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." *McDonald v. Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n*, 259 N.C. App. 582, 589 (2018) (cleaned up). "When a plaintiff alleges a UDTP violation based upon a breach of contract, the plaintiff must show substantial aggravating circumstances attending the breach[.]" *Dan King Plumbing Heating & Air Conditioning, LLC v. Harrison*, 281 N.C. App. 312, 320 (2022) (cleaned up). "As a general proposition,

unfairness or deception either in the formation of the contract or in the circumstances of its breach may establish the existence of substantial aggravating circumstances[.]" *SciGrip, Inc. v. Osae*, 373 N.C. 409, 426 (2020) (cleaned up). However, "[i]t is not enough to allege [the] aggravating or egregious results of a breach. If that were the case, then any contract dispute that results in serious losses could present a valid UDTP[] claim, a result North Carolina courts have repeatedly rejected." *Edwards v. Genex Coop., Inc.*, 777 Fed. Appx. 613, 623 (4th Cir. 2019) (cleaned up), *cert. denied*, 140 S. Ct. 853 (2020).

173. Implus alleges that the relevant aggravating circumstances concern Bates and Hale entering into the 2024 SRAs with no intention or ability to comply with their terms—specifically with respect to Section 5.

174. Section 5 states in relevant part as follows:

> The Representative hereby represents and warrants to Implus that this Agreement is the binding, legal obligation of Representative, is enforceable in accordance with its terms, and the execution of this Agreement by Representative will not result in any violation of any agreement, instrument or contract to which Representative is a party.

(ECF No. 74.2, at 2, 11–12.)

175. According to Implus, Bates and Hale knew that this representation was false at the time that they entered into the 2024 SRAs because H.B. Shoes Co. and The Mike Hale Company had already contracted to work as "exclusive" sales representatives for Blue San. This misrepresentation was further compounded, Implus contends, by Bates and Hale falsely representing—through their then-counsel—that they would not work for Vore or Blue San in the future.

176. The making of deceptive representations during contract formation and inducements to enter into a contract "while having no intention of keeping the promises made" are "classic example[s] of [] aggravating circumstance[s]." *Pee Dee Elec. Membership Corp. v. King*, 2018 NCBC LEXIS 22, at *18–19 (N.C. Super. Ct. Mar. 15, 2018) (cleaned up). "Substantial aggravating circumstances after contract formation typically require: (1) the forgery or destruction of documents; (2) concealment of a breach coupled with conduct designed to deter investigation into the breach; or (3) intentional deception designed to allow the defendant to receive the benefits of the contract." *Pathos Ethos, Inc. v. Braintap Inc.*, 2024 NCBC LEXIS 154, at *25 (N.C. Super. Ct. Dec. 9, 2024) (cleaned up).

177. Having thoroughly reviewed the allegations in the proposed Third Amended Complaint, the Court is satisfied that Implus has sufficiently alleged substantial aggravating circumstances to state a claim for UDTP. *See Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *62 (N.C. Super. Ct. Nov. 3, 2011) (finding substantial aggravating circumstances based on false representations that the defendant "was not an employee or sales representative of" a competitor at the time he contracted with the plaintiff); *Lendingtree, LLC v. Intercontinental Cap. Grp., Inc.*, 2017 NCBC LEXIS 54, at *8–9 (N.C. Super. Ct. June 23, 2017) (holding that efforts to "circumvent" a restrictive covenant through a "scheme . . . to enjoy both the benefit of its bargain [with plaintiff] and the benefit of its breach . . . akin to concealment of a breach" to advance a competitor's interests were substantial aggravating circumstances); *see also Sparrow Sys., Inc. v. Priv. Diagnostic Clinic,*

*PLLC*, 2014 NCBC LEXIS 70, at \*44–45 (N.C. Super. Ct. Dec. 24, 2014) (denying a motion to dismiss a UDTP claim where the plaintiff alleged that the defendant "engaged in deceitful conduct in order to effectuate and conceal its breaches" including by "procur[ing] [p]laintiff's proprietary information under" false pretenses); *Comic Book Certification Serv. LLC v. CBCS Operations, LLC*, 2025 NCBC LEXIS 81, at \*36 (N.C. Super. Ct. July 9, 2025) (finding substantial aggravating circumstances based on "an elaborate scheme" which was made possible through "the siphoning of funds and assets (including intellectual property)" from the company).

178.    Therefore, H.B. Shoes Co. and The Mike Hale Company's Motion to Dismiss Implus's claim for UDTP is **DENIED**.

## III.    Vore and Blue San's Motion to Dismiss

179.    The previously asserted claims in the proposed Third Amended Complaint against Vore and Blue San are for misappropriation of trade secrets, tortious interference with contract, and UDTP.  The proposed Third Amended Complaint also restates a claim against Vore, individually, for breach of contract and claims solely against Blue San for conspiracy relating to H.B. Shoes. Co. and The Mike Hale Company's alleged breaches of the 2024 SRAs.

### A.    Breach of Contract

180.    As an initial matter, with regard to Implus's claim against Vore for breach of contract, the Court notes that Implus has not alleged that any *substantive* provision of the Separation Agreement was breached.  (Tr., at 83.)   Rather, the Separation Agreement is only relevant in that it reaffirms that Vore—as a

stockholder of IMGH—continues to be bound by the terms of the IMGH Stockholders Agreement. (Tr., at 83.) It is the latter document that Implus claims Vore has breached.

181. With respect to the IMGH Stockholders Agreement, the parties agree that pursuant to the choice-of-law provision in Section 4.7, Delaware substantive law governs Implus's claims arising out of that Agreement. (ECF No. 59.1, at 47; Tr., at 7.)

### 1. Implied Covenant of Good Faith and Fair Dealing

182. Implus's first theory of breach of contract is that Vore breached the implied covenant of good faith and fair dealing with respect to Section 2.8 of the IMGH Stockholders Agreement.

183. That Section states as follows:

<u>Financial and Business Information</u>. From and after the date hereof, for so long as any Stockholder, together with its Affiliates, holds at least one percent (1%) of the issued and outstanding Company Stock, such Stockholder shall be entitled to receive from the Company the following information: (a) as soon as practicable after the end of each quarter of each fiscal year of the Company, unaudited consolidated quarterly financial reports of the Company and its consolidated Subsidiaries for the first three (3) fiscal quarters of each year, which shall be provided at the same time that the Company is required to provide such financial reports to the Company's lenders; and (b) as soon as practicable after the end of each fiscal year of the Company, audited consolidated annual financial reports of the Company and its consolidated Subsidiaries, including the auditor's report, the year-end consolidated balance sheet, the related statements of income and retained earnings, stockholder's equity and cash flow for the fiscal year then ended, and all notes and schedules thereto, which shall be provided at the same time that the Company is required to provide such financial reports to the Company's lenders; *provided, however,* that the Company may require any such Stockholder making a request under this <u>Section 2.8</u> to enter into a customary confidentiality agreement which may include a covenant not

to use or disclose Proprietary Information contained in the requested information and to create appropriate internal information walls. Notwithstanding the foregoing, *the Company is not required to provide any Stockholder with such information if such Stockholder (i) becomes an employee or director of, investor in, or lender or advisor to, or otherwise becomes associated or affiliated with, a Competitor*, (ii) violates his or her non-competition, no-hire or non-solicitation obligations with the Company, (iii) provides consulting services to a Competitor or (iv) holds one percent (1%) or more of the securities or debt of a Competitor.

(ECF No. 59.1, at 30 (emphasis added).)

184. Implus contends that Vore breached the implied covenant of good faith and fair dealing by continuing to accept shareholder information pursuant to Section 2.8 without informing Implus that Vore had (1) co-founded Blue San in 2020, and (2) accepted employment as Blue San's Director of Sales, Marketing, and Operations in 2023. In a nutshell, Implus argues that the implied covenant of good faith and fair dealing gave rise to an implied duty for Vore to inform Implus of his relationship with Blue San.

185. Our Supreme Court has recently addressed an analogous argument concerning the implied covenant of good faith and fair dealing under Delaware law. *See Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250 (2023).

Under Delaware law, courts "interpret contracts as a whole," "will give each provision and term effect, so as not to render any part of the contract mere surplusage," and "will not read a contract to render a provision or term meaningless or illusory." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (quoting *Osborn ex rel. Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)[)]. "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d at 56–57 (quoting *Osborn*, 991 A.2d at 1159–60). It is true that under Delaware law the implied covenant of good faith and fair dealing "inheres in every contract," *Chamison v. HealthTrust, Inc.—The Hosp.*

*Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), and may be used to imply terms for "developments that could not be anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). However, the covenant of good faith and fair dealing "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated." *Nemec*, 991 A.2d at 1128. Indeed, the covenant of good faith and fair dealing should not be applied "to give the plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'" *Winshall v. Viacom Int'l Inc.*, 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)).

*Value Health Sols., Inc.*, at 267–68.

186. Far from being a development that could not have been anticipated at the time the parties entered into the IMGH Stockholders Agreement, the plain language of Section 2.8 clearly demonstrates that the parties considered and bargained for their respective rights and obligations in circumstances such as those present here—that is, where an IMGH stockholder becomes an owner of—or is employed by—a competitor.

187. Indeed, at the 8 May hearing, Implus's counsel admitted that this is the "exact scenario" that the parties "specifically bargained for" and that Implus "certainly could've" included an express provision requiring Vore to disclose his affiliation with Blue San. (Tr., at 93–94.) However, having failed to do so, Implus cannot now use the implied covenant of good faith and fair dealing to demand judicial recognition of a right that could have been (but was not) included in the contract. *See Blaustein v. Lord Balt. Cap. Corp.*, 84 A.3d 954, 959 (Del. 2014) (stating that the implied covenant of good faith and fair dealing was inapplicable where "the parties did consider whether, and on what terms, minority stockholders would" have certain rights and obligations); *Red Cat Holdings, Inc. v. Autonodyne LLC*, 2024 Del. Ch.

LEXIS 19, at *27 (Del. Ch. Jan. 30, 2024) (concluding that where there were "express terms" saliant to the dispute, the circumstances were not "unanticipated and silent" and therefore, "suitable for the implied covenant's application" (footnote omitted)).

188. Accordingly, Vore's Motion to Dismiss Implus's claim for breach of the implied covenant of good faith and fair dealing with respect to Section 2.8 of the IMGH Stockholders Agreement is **GRANTED**, and that claim is **DISMISSED** with prejudice.

## 2. Breach of Confidentiality Provisions

189. Implus's second theory with respect to this claim is that Vore breached Sections 2.8 (which is quoted above) and 2.9 of the IMGH Stockholders Agreement by sharing the information he had received as a shareholder with Blue San, Bates, and Hale.

190. Section 2.9 of the IMGH Stockholders Agreement states as follows:

Confidentiality. Each Stockholder shall maintain the confidentiality of any confidential and proprietary information of the Company and its Subsidiaries ("Proprietary Information") using the same standard of care, but in no event less than reasonable care, as it applies to its own confidential and proprietary information, except (a) for any Proprietary Information which is publicly available (other than as a result of dissemination by such Stockholder) or a matter of public knowledge generally, (b) if the release of such Proprietary Information is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; *provided*, that, to the extent not prohibited under applicable law, such Stockholder has given the Company prior written notice of such order so that the Company may seek a protective order or other appropriate remedy prior to such Stockholder's disclosure of any Proprietary Information and/or waive compliance with the terms of this Section 2.9, or (c) for Proprietary Information that was known to such Stockholder on a non-confidential basis, without, to such Stockholders' knowledge, breach of any third party's confidentiality obligations, prior to its disclosure by the Company. Notwithstanding any of the foregoing,

the Berkshire Stockholders shall be permitted to report and disclose any Proprietary Information to their limited partners if required by their governing documents with those limited partners.

(ECF No. 59.1, at 30–31.)

191. Implus alleges that Vore has breached Sections 2.8 and 2.9 in the following ways:

Vore continued to receive Implus's proprietary financial and business information through Section 2.8 of the Stockholder Agreement, including on October 23, 2023, February 1, 2024, and most recently on May 13, 2024—all while he was, upon information and belief based on Blue San's August 30, 2024 filings in this case, constructing Blue San's entry into a competing market with Implus.

. . .

Upon information and belief, Vore and Blue San misused Implus's proprietary financial and business information listed in Paragraphs 32, 42, and 48 to aid Blue San's plans to enter the market for footwear accessories and shoe care products and compete with Implus, as well as misuse and mischaracterize that proprietary financial and business information to damage Implus.

Upon information and belief, through Vore's actions, Blue San therefore knowingly acquired Implus's proprietary financial and business information listed in Paragraphs 32, 42, and 48.

. . .

On or around June 19, 2024, Vore said to Bates and Hale that he "sees the financials" of Plaintiffs and proceeded to share with Bates and Hale (a) deceptive and misleading mischaracterizations about Plaintiffs' proprietary business and financial reports and financial condition listed in Paragraphs 32, 42, and 48 that he obtained as a stockholder, and (b) upon information and belief, cherry-picked information from Plaintiffs' proprietary business and financial reports listed in Paragraphs 32, 42, and 48 he obtained as a stockholder and disclosed that information to Bates and Hale.

Vore shared that information for the purpose of convincing Bates and Hale to repudiate and breach their agreements with Implus on behalf of H.B. Shoes and The Mike Hale Company.

Upon information and belief, during that communication, Vore also disclosed to Bates and Hale, on behalf of H.B. Shoes and The Mike Hale Company, some of Implus's future strategic plans that Vore obtained as a shareholder and deceptively indicated this would undercut H.B. Shoes' and The Mike Hale Company's business and compensation under their agreements with Implus.

. . .

Vore has thus used, and continues to use, in a wrongful, deceptive, and misleading manner, the Implus and Holdings confidential and proprietary information listed in Paragraphs 32, 42, and 48 he obtained as a Holdings stockholder to the detriment of Implus and Holdings and, upon information and belief, to benefit Blue San's competing line of shoe care and related products.

. . .

Vore breached his contractual obligations under at least Section 3 of the Separation Agreement and Section 2.9 of Stockholders Agreement by, including but not limited to, failing to maintain the confidentiality of the proprietary business and financial information listed in Paragraphs 32, 42, and 48 he received as a stockholder with the requisite level of care.

(TAC ¶¶ 48, 50–51, 88–90, 96, 238.)

192. In their respective briefs—and at the 8 May hearing—the parties offered dueling interpretations of Section 2.9 and how it interrelates with Section 2.8—which, once again, authorizes IMGH to require that any stockholder receiving information pursuant to Section 2.8 "enter into a customary confidentiality agreement which may include a covenant not to use or disclose Proprietary Information contained in the requested information and to create appropriate internal information walls." (ECF No. 59.1, at 30.)

193. Implus contends that the "customary confidentiality agreement" referenced in Section 2.8 is not an independent document, but rather, an internal reference to Section 2.9. In essence, Implus contends that Section 2.9 *is* the

customary confidentiality agreement referred to in Section 2.8—meaning that all information shared pursuant to Section 2.8 is bound by the confidentiality restrictions set out in Section 2.9.

194. Vore, conversely, argues that Section 2.9 does not apply to information shared pursuant to Section 2.8 at all. Rather, Vore asserts that any information shared pursuant to Section 2.8 can *only* be protected through an independent confidentiality agreement and that—absent such an agreement—there are no restrictions on Vore's ability to share the information he has received pursuant to Section 2.8. Under this interpretation, Section 2.9's confidentiality restrictions only apply to information shared with IMGH stockholders for reasons other than those set forth in Section 2.8.

195. Although the Court need not (and does not) make a final determination as to the proper interpretation of these provisions, one plausible interpretation of them is that Section 2.9 creates a "baseline" confidentiality standard for all information shared pursuant to the IMGH Stockholders Agreement and that Section 2.8 contemplates that IMGH might desire to protect certain information beyond the "baseline" standard in Section 2.9—through more strict independent confidentiality agreements.

196. Under this interpretation, Implus has sufficiently alleged that IMGH shared confidential information with Vore pursuant to Section 2.8 and that Vore failed to act reasonably by sharing that information with Blue San, Bates, and Hale. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)

(concluding that "[b]ecause the provisions at issue in the [a]greement are susceptible to more than one reasonable interpretation, for purposes of deciding a motion to dismiss, their meaning must be construed in the light most favorable to the non-moving party" (cleaned up)); *see also Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 NCBC LEXIS 55, at \*23 (N.C. Super. Ct. June 18, 2021) (concluding that "allegations that [defendants] signed the [e]mployment [a]greement agreeing to the [n]ondisclosure [p]rovision, had access to and acquired [plaintiff's] [c]onfidential [i]nformation, and improperly used" it were sufficient at the motion to dismiss stage); *Wolfspeed, Inc. v. Van Brunt*, 2025 NCBC LEXIS 40, at \*25 (N.C. Super. Ct. Apr. 2, 2025) (finding that allegations that the defendant "retained his [company] issued laptop" and subsequently "accessed, attempted to access, or had access to a large volume of highly confidential data" were "marginally sufficient" to state a claim for breach of a confidentiality agreement (cleaned up)).

197. Alternatively, to the extent that Sections 2.8 and 2.9 are subject to multiple reasonable interpretations, they are ambiguous and require the discovery of extrinsic evidence to enable the Court to ascertain the parties' intent. *See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (noting that "[o]n a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents" and that "[d]ismissal is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law" (cleaned up)); *see also TAC Invs., LLC v. Rodgers*, 2020 NCBC LEXIS 143, at \*9–10 (N.C. Super. Ct. Dec. 7, 2020)

(denying a motion to dismiss where a contract was "ambiguous" and subject to multiple "reasonable interpretations"); *Perry v. Frigi-Temp Frigeration, Inc.*, 2020 NCBC LEXIS 100, at *14–15 (N.C. Super. Ct. Sept. 3, 2020) (concluding that a motion to dismiss should be denied when a contract is "capable of at least two reasonable interpretations" when "viewed within the context of the [a]greement[] as a whole"); *W & W Partners, Inc. v. Ferrell Land Co.*, 2018 NCBC LEXIS 52, at *17–21 (N.C. Super. Ct. May 22, 2018) (finding that "[p]laintiffs have adequately ple[d] a breach" based on a reasonable interpretation of ambiguous language).

198.    Accordingly, Vore's Motion to Dismiss Implus's claim for breach of the confidentiality provisions of the IMGH Stockholders Agreement is **DENIED**.

### B.    Misappropriation of Trade Secrets

199.    North Carolina's Trade Secrets Protection Act ("NCTSPA") provides that "[t]he owner of a trade secret shall have [a] remedy by civil action for misappropriation of his trade secret."  N.C.G.S. § 66-153.

200.    The NCTSPA defines a "trade secret" as:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

  a.    Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

  b.    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

201.    The proposed Third Amended Complaint states as follows with regard

to Implus's purported trade secrets:

Section 2.8 of the Stockholders Agreement states that any Stockholder who holds at least one percent of Company Stock (which includes Vore) "shall be entitled to receive from the Company the following information":

(a) as soon as practicable after the end of each quarter of each fiscal year of the Company, unaudited consolidated quarterly financial reports of the Company and its consolidated Subsidiaries for the first three (3) fiscal quarters of each year, which shall be provided at the same time that the Company is required to provide such financial reports to the Company's lenders; and (b) as soon as practicable after the end of each fiscal year of the Company, audited consolidated annual financial reports of the Company and its consolidated Subsidiaries, including the auditor's report, the year-end consolidated balance sheet, the related statements of income and retained earnings, stockholder's equity and cash flow for the fiscal year then ended, and all notes and schedules thereto, which shall be provided at the same time that the Company is required to provide such financial reports to the Company's lenders . . . .

Those financial reports include, but are not limited to, Implus's management discussion and analysis, net revenue, gross margins, operating expenses, financial data related to Implus's customers, revenue and gross margins for each of the Implus brands, working capital and cash flow, EBITDA data, assets, liabilities, marketing expenses, personnel expenses, and financial results for each of the Implus entities—all of which is highly confidential and proprietary.

(TAC ¶¶ 31–32.)[7]

202.    The NCTSPA defines "misappropriation" as the "acquisition, disclosure,

or use of a trade secret of another without express or implied authority or consent,

unless such trade secret was arrived at by independent development, reverse

---

[7] Specifically, Implus alleges that it sent this information to Vore on at least twelve specifically identified dates between August 2021 and May 2024.  (TAC ¶ 42.)

engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1).

203. Implus alleges that Vore and Blue San have misappropriated its trade secrets by, *inter alia*, sharing them with Bates and Hale.

204. In response, Vore and Blue San assert that Implus has failed to (1) describe its trade secrets with sufficient particularity; (2) detail the reasonable security measures it has taken to protect the secrecy of the information; and (3) allege specific acts of misappropriation by Vore and Blue San.

205. The Court, however, only needs to address their second argument because even assuming *arguendo* that Implus has alleged a protectable trade secret, "trade secret protection can be lost if adequate measures were not taken to [e]nsure that the information was, in fact, kept [secret]." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *27 (N.C. Super. Ct. Apr. 23, 2015).

206. "Although the reasonableness of measures taken to protect the confidentiality of information claimed to be a trade secret is often appropriate for resolution by a jury, the absence of evidence of such measures can result in the dismissal of the claim as a matter of law." *Campbell Sales Grp., Inc. v. Nitroflex by Jiufeng Furniture, LLC*, 2022 NCBC LEXIS 148, at *23–24 (N.C. Super. Ct. Dec. 5, 2022). "General allegations regarding only internal security measures do not suffice" when the purported trade secrets are shared with third parties. *Hose Co. v. Smith*, 2025 NCBC LEXIS 36, at *19 (N.C. Super. Ct. Mar. 28, 2025) (cleaned up).

207. The proposed Third Amended Complaint alleges the following with regard to the security measures utilized by Implus:

> The proprietary financial and business information in the financial reports as described in Paragraphs 32, 42, and 48 further qualifies as a trade secret because it has been the subject of efforts to maintain its secrecy because they are only shared with and accessible by a limited number of individuals; Plaintiffs' stockholders, executives, board members and others who receive these reports are bound to keep the information confidential; Implus and Holdings are privately-held, so those reports are not available to the public; the reports are housed in Plaintiffs' financial department in a network drive not accessible by most employees; and anytime Plaintiffs are required to provide the information to a third-party (such as an insurance carrier), they require a signed nondisclosure agreement to be in place.

(TAC ¶ 245.)

208. The Court finds these allegations to be insufficient for a number of reasons.

209. As an initial matter, despite stating that the information is shared with only "a limited number of individuals," Implus does not describe who those individuals are or why sharing the purported trade secret information with them is necessary. Likewise, Implus asserts that the information is stored on a "financial department . . . network drive" that is "not accessible by *most* employees[.]" (TAC ¶ 245.) Yet, Implus makes no attempt to clarify the phrase "most employees" or explain why it is reasonable to allow access for those employees who are, in fact, granted access to the network drive containing the information.

210. Furthermore, Implus concedes that the purported trade secret information is known—without further explanation—by "others" (presumably, third parties). (TAC ¶¶ 244–45.) The proposed Third Amended Complaint does not

specifically identify who these "others" are or why they are given access to this information. However, based on the language of Section 2.8 of the IMGH Stockholders Agreement, it is clear that Implus's purported trade secrets are shared with, at a bare minimum, (1) every IMGH stockholder having more than a one percent ownership interest in IMGH; (2) Implus's lenders; and (3) Implus's insurance providers. (*See* ECF No. 59.1, at 30.)

211. Finally, despite the language in Section 2.8 stating that Implus is not required to send the information at issue to IMGH stockholders unless the stockholder makes an affirmative "request" to IMGH, Implus concedes that its "usual practice" is to send the information "automatically on a quarterly basis, without requiring or waiting for requests from each [s]tockholder." (*See* ECF No. 59.1, at 30; TAC ¶ 33.) Notably, the proposed Third Amended Complaint is silent as to any precautions or security measures in place to ensure that such "automatic" communications are only sent to—and accessible by—*bona fide* IMGH stockholders who are entitled to receive the information.

212. For all of these reasons, Implus has failed to allege that they have taken security measures that are reasonable under the circumstances to protect the secrecy of the information. *See BIOMILQ, Inc. v. Guiliano*, 2023 NCBC LEXIS 24, at *21–22 (N.C. Super. Ct. Feb. 10, 2023) (holding that merely "stating something is secure or kept confidential is not enough to survive a motion to dismiss" and concluding that general allegations of security measures, such as "not shar[ing]" the information with others, keeping the information in a "secure location," and using "lock[s]" or

"password protect[ions]" are insufficient (cleaned up)); *McKee v. James*, 2013 NCBC LEXIS 33, at \*38–39 (N.C. Super. Ct. July 24, 2013) (finding general allegations that the information was "protected by a password" to be insufficient under the NCTSPA); *see also Hose Co.*, 2025 NCBC LEXIS 36, at \*19 (holding that "general allegations . . . do not suffice" to state a claim and that the burden is on the plaintiff to demonstrate that the requirements of N.C.G.S. § 66-152(3) have been met) (cleaned up).

213. Accordingly, Vore and Blue San's Motion to Dismiss Implus's claim for misappropriation of trade secrets is **GRANTED**, and that claim is **DISMISSED** with prejudice.

### C. Tortious Interference with Contract

214. Our Supreme Court has articulated the following elements of a tortious interference with existing contract claim:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Lab'ys, Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (cleaned up).

215. Implus alleges that Vore and Blue San have tortiously interfered with various provisions of its contracts with H.B. Shoes Co. and The Mike Hale Company.

#### 1. Tortious Interference with the Confidentiality Provisions of the 2012, 2014, and 2024 SRAs

216. First, Implus alleges that Vore and Blue San have tortiously interfered with the confidentiality provisions of the 2012, 2014, and 2024 SRAs by repeatedly

requesting that Bates and Hale forward Implus's confidential customer information to them.

217. In support of this theory, the proposed Third Amended Complaint alleges the following:

> Blue San's Matt Carter (formerly Vice President of International Sales at Implus and who worked at Implus from roughly 2002 to 2020) specifically asked Hugh Bates to forward the Customer 1/Implus confidential information to Blue San, thanked Bates upon receipt of the data several times, and met with Bates to discuss Customer 1.
>
> . . .
>
> Upon information and belief based on discovery collected from third-party subpoena to The Mike Hale Company in December 2024 and January 2025, Blue San's Matt Carter asked Mike Hale, on behalf of The Mike Hale Company, to forward those confidential Implus Sof Sole/Customer 2 reports to Blue San several times. Hale complied, at a minimum, twice in March 2024 and once in April 2024.
>
> Upon information and belief based on discovery collected from third-party subpoenas to H.B. Shoes and The Mike Hale Company in December 2024 and January 2025, Bates and Hale also orally discussed the confidential Implus/Customer 1 and Implus Sof Sole/Customer 2 reports with Blue San on behalf of H.B. Shoes and The Mike Hale Company.
>
> . . .
>
> Sometime between June 17 and June 19, 2024, after Bates and Hale signed the 2024 Sales Representative Agreements on behalf of H.B. Shoes and The Mike Hale Company (without ever informing Implus they had been sharing Implus's confidential information with Vore or Blue San), they informed Vore that they had signed agreements with Implus to serve as sales representatives.
>
> . . .
>
> Vore and Blue San had knowledge of the facts giving rise to the 2024 Sales Representative Agreements, and the Agreements themselves, following no later than Vore's communication(s) with the Sales Representatives between June 17 and June 19, 2024.

. . .

Blue San had knowledge of H.B. Shoes' 2012 Sales Representative Agreement and Hale's 2014 Sales Representative Agreement given Todd Vore's, Rich Chang's, Merrick Jones's, and Matt Carter's prior high-level roles at Implus.

Blue San intentionally induced Bates, on behalf of H.B. Shoes, to breach Section 11 of the H.B. Shoes 2012 Sales Representative Agreement and Section 10 of the H.B. Shoes 2024 Sales Representative Agreement by requesting Bates, on behalf of H.B. Shoes, to forward the confidential Implus/Customer 1 brand reports to Blue San.

Blue San intentionally induced Hale, on behalf of The Mike Hale Company, to breach Section 11 of Hale's 2014 Sales Representative Agreement and Section 10 of Hale's 2024 Sales Representative Agreement by requesting Hale, on behalf of The Mike Hale Company to forward the confidential Implus Sof Sole/Customer 2 brand reports to Blue San.

Blue San acted without justification and without a legitimate business purpose because they induced H.B. Shoes and The Mike Hale Company to violate their confidentiality provisions by forwarding the confidential Implus/Customer 1 and Implus Sof Sole/Customer 2 reports to Blue San and discussing them with Blue San.

Blue San's tortious interference with H.B. Shoes' 2012 Sales Representative Agreement, Hale's 2014 Sales Representative Agreement, and the confidentiality clauses in both of the 2024 Sales Representative Agreements resulted in and proximately caused actual damages to Implus by having Implus's confidential business and financial information revealed to Blue San for the purpose of benefitting Blue San's competing business efforts.

(TAC ¶¶ 80, 84–85, 87, 258, 263–67.)

218.    Vore and Blue San assert that these allegations are insufficient for three reasons: (1) Vore and Blue San were acting in pursuit of their legitimate business interests when soliciting market information from Bates and Hale; (2) Implus failed to allege that Vore or Blue San had specific knowledge of the confidentiality clauses

at issue; and (3) Implus has suffered no actual harm as a result of Vore and Blue San's conduct.

219. As to Vore and Blue San's first argument, our Supreme Court has recognized that "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Peoples Sec. Life Ins. v. Hooks*, 322 N.C. 216, 221 (1988) (cleaned up). However, this Court has repeatedly noted that "the distinction between seeking to destroy a competitor and a lawful competitive interest may be blurry." *Truist Fin. Corp. v. Rocco*, 2024 NCBC LEXIS 62, at *37 (N.C. Super. Ct. Apr. 25, 2024).

220. Here, the proposed Third Amended Complaint alleges that Vore and Blue San's conduct was part of an overall "conspiracy" through which Vore, Bates, and Hale would misappropriate Implus's confidential business information to be used for Blue San's benefit. This Court has previously held that similar allegations were sufficient to show that the interference was without justification. *See id.* (concluding that the defendants' conduct was without justification when they allegedly "planned and executed a scheme to use [p]laintiffs' confidential and trade secret information . . . to cripple [p]laintiffs' ability to compete"); *Sandhills Home Care, L.L.C. v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, at *48 (N.C. Super. Ct. Aug. 1, 2016) (finding that "allegation[s] of a specific plan or scheme to destroy [p]laintiff's business goes beyond reasonable competitive behavior"); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2003 NCBC LEXIS 6, at *144 (N.C.

Super. Ct. May 2, 2003) (holding that "disrupt[ing] [plaintiff's] business and tak[ing] advantage of [its] employees' knowledge of confidential business information . . . crosses over the line of fair competition").

221. With regard to Vore and Blue San's second argument, our Supreme Court has held that broad and conclusory allegations that the defendants knew of the contracts at issue are insufficient to support a tortious interference with contract claim. *See Krawiec*, 370 N.C. at 607. Instead, a plaintiff must allege "*how* the [defendants] could have known of the alleged" contracts at issue. *Id.* (emphasis added).

222. As to the 2012 and 2014 SRAs, Implus alleges that Vore had knowledge of those agreements because he personally knew—and worked with—Bates and Hale prior to leaving Implus in 2020 and because he was the President of Implus at the time that those agreements were entered into.

223. As to the 2024 SRAs, Implus alleges that Bates and Hale directly informed Vore of the 2024 SRAs—both prior to and during their meeting with him on 19 June 2024.

224. These assertions are more specific than the vague and conclusory allegations that North Carolina courts have rejected and instead allege sufficient facts demonstrating *how* Vore and Blue San would have had knowledge of the contracts at issue. *Cf. Salon Blu, Inc. v. Salon Lofts Grp., LLC*, 2018 NCBC LEXIS 72, at *12 (N.C. Super. Ct. July 16, 2018) (dismissing a claim where "[plaintiff] d[id] not allege any facts supporting the conclusion that [defendant] had knowledge of the

[e]mployment [a]greements[,]" and only alleged that "[defendant] 'knew or should have known' about" them).

225. Vore and Blue San's third argument fares no better. It is true that North Carolina courts have held that "monetary damages or actual pecuniary harm to plaintiffs . . . is a required element of tortious interference with contract." *Burgess v. Busby*, 142 N.C. App. 393, 404 (2001) (cleaned up). Such damages are typically "connected to a contract[ual] right." *Se. Anesthesiology Consultants, PLLC v. Charlotte-Mecklenburg Hosp. Auth.*, 2019 NCBC LEXIS 107, at *20 (N.C. Super. Ct. Dec. 13, 2019) (cleaned up).

226. Implus has alleged that as a result of Vore and Blue San's interference, Bates and Hale have breached the terms of the 2012, 2014, and 2024 SRAs by disclosing Implus's confidential and proprietary information. At the pleadings stage, such allegations are sufficient to state a valid claim. *See Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 501 (1992) (holding that "under the liberal concept of notice pleading[,]" a plaintiff only need "give sufficient notice of the events on which the claim is based to enable defendants to respond and prepare for trial and are sufficient to satisfy the substantive elements of the claim of tortious interference with contract") (cleaned up).

227. Therefore, Vore and Blue San's Motion to Dismiss Implus's claim for tortious interference with the confidentiality provisions of the 2012, 2014, and 2024 SRAs is **DENIED**.

### 2. Tortious Interference with the Term and Services Provisions of the 2024 SRAs

228. Second, Implus alleges that Vore and Blue San have tortiously interfered with the term and services provisions of the 2024 SRAs by convincing Bates and Hale to repudiate the 2024 SRAs.

229. In support of this theory, the proposed Third Amended Complaint alleges that

> [s]ometime between June 17 and June 19, 2024, after Bates and Hale signed the 2024 Sales Representative Agreements on behalf of H.B. Shoes and The Mike Hale Company (without ever informing Implus they had been sharing Implus's confidential information with Vore or Blue San), they informed Vore that they had signed agreements with Implus to serve as sales representatives.
>
> On or around June 19, 2024, Vore said to Bates and Hale that he "sees the financials" of Plaintiffs and proceeded to share with Bates and Hale (a) deceptive and misleading mischaracterizations about Plaintiffs' proprietary business and financial reports and financial condition listed in Paragraphs 32, 42, and 48 that he obtained as a stockholder, and (b) upon information and belief, cherry-picked information from Plaintiffs' proprietary business and financial reports listed in Paragraphs 32, 42, and 48 he obtained as a stockholder and disclosed that information to Bates and Hale.
>
> Vore shared that information for the purpose of convincing Bates and Hale to repudiate and breach their agreements with Implus on behalf of H.B. Shoes and The Mike Hale Company.
>
> Upon information and belief, during that communication, Vore also disclosed to Bates and Hale, on behalf of H.B. Shoes and The Mike Hale Company, some of Implus's future strategic plans that Vore obtained as a shareholder and deceptively indicated this would undercut H.B. Shoes' and The Mike Hale Company's business and compensation under their agreements with Implus.
>
> Vore's efforts to convince Bates and Hale to repudiate and breach H.B. Shoes' and The Mike Hale Company's 2024 Sales Representative Agreements with Implus succeeded.

On June 19, 2024, Bates and Hale, on behalf of H.B. Shoes and The Mike Hale Company, notified Implus that they "should not have entered" their agreements with Implus, and would not honor the 2024 Sales Representative Agreements that they signed two days prior.

Almost immediately thereafter on June 19, 2024, counsel for H.B. Shoes and The Mike Hale Company confirmed in writing that they "hereby decline appointment as sales representatives of Implus Footcare, LLC, effective immediately."

On June 25, 2024, counsel for Bates and Hale, on behalf of H.B. Shoes and The Mike Hale Company stated in writing that at least part of the reason for the repudiation was that the Sales Representatives had concerns about Implus's financial condition and that Implus had contracted with a customer to sell products "undercutting Bates's and Hale's business," both of which concerns were reportedly based on information "from third party sources." Upon information and belief, Vore was the source of this information. Neither the Sales Representatives nor their then-counsel mentioned any agreement with Blue San as a reason for repudiating.

H.B. Shoes and The Mike Hale Company have repudiated the 2024 Sales Representative Agreements and refused to honor them because of Vore's misrepresentations about Implus's proprietary and confidential information.

Vore has thus used, and continues to use, in a wrongful, deceptive, and misleading manner, the Implus and Holdings confidential and proprietary information listed in Paragraphs 32, 42, and 48 he obtained as a Holdings stockholder to the detriment of Implus and Holdings and, upon information and belief, to benefit Blue San's competing line of shoe care and related products.

. . .

Vore and Blue San had knowledge of the facts giving rise to the 2024 Sales Representative Agreements, and the Agreements themselves, following no later than Vore's communication(s) with the Sales Representatives between June 17 and June 19, 2024.

Vore and Blue San intentionally induced H.B. Shoes and The Mike Hale Company to repudiate, breach, and not to perform under the 2024 Sales Representative Agreements.

Vore and Blue San acted without justification and without a legitimate business purpose because they induced Bates and Hale on behalf of H.B.

Shoes and The Mike Hale Company by unlawfully using, and also selectively and deceptively misrepresenting, Plaintiffs' confidential and proprietary information Vore obtained as a stockholder as described in Paragraphs 32, 42, and 48.

Vore's and Blue San's tortious interference with the 2024 Sales Representative Agreements resulted in and proximately caused actual damages to Implus by depriving Implus of the benefit of the 2024 Sales Representative Agreements.

(TAC ¶¶ 87–96, 258–61 (cleaned up).)

230. Vore and Blue San argue that Implus has failed to plead that their actions were without justification, that they knew of the specific provisions of the 2024 SRAs at issue, and that Implus has suffered actual damages.

231. As noted above, our Supreme Court has recognized that competition in business is generally justified so long as it is accomplished "by means that are lawful." *Peoples Sec. Life Ins.*, 322 N.C. at 221 (cleaned up). However, "[t]his Court has made clear that a defendant-competitor cannot escape liability on a tortious interference claim by arguing that it acted with justification where the competitor competed through the use of unlawful means." *Miller v. Redgoose, L.L.C.*, 2024 NCBC LEXIS 148, at *16–17 (N.C. Super. Ct. Nov. 26, 2024) (cleaned up); *see also Mech. Sys. & Servs., Inc. v. Howard*, 2021 NCBC LEXIS 69, at *13 (N.C. Super. Ct. Aug. 11, 2021) (concluding that while "competition in business constitutes justifiable interference[,]" such a privilege is lost where "the amended complaint alleges that the means of competition used by [defendants] . . . were not lawful" (cleaned up)); *MarketPlace 4 Ins. v. Vaughn*, 2023 NCBC LEXIS 31, at *35–36 (N.C. Super. Ct. Feb. 24, 2023) (observing that such a limitation is "eminently logical" because "if a defendant could automatically escape liability on a tortious interference claim simply by claiming that

it was engaged in a competitive relationship with the plaintiff during the time period referenced in the complaint, then it would be virtually impossible for a plaintiff to *ever* succeed on a tortious interference claim").

232. Rather than alleging lawful business competition by Vore and Blue San, however, Implus has instead alleged that they induced Bates and Hale to repudiate the 2024 SRAs by unlawfully "cherry-picking" and deceptively disclosing confidential information that Vore had received pursuant to Section 2.8 of the IMGH Stockholders Agreement.

233. Because Implus has adequately alleged that Vore (individually and as an agent of Blue San) breached the IMGH Stockholders Agreement in the manner discussed above, so too has Implus sufficiently alleged that Vore and Blue San's interference was without justification. *See, e.g., Fin. Carrier Servs. LLC v. Kingpin Cap. Inc.*, 2025 NCBC LEXIS 72, at \*12 (N.C. Super. Ct. June 19, 2025) (denying a motion to dismiss where the defendant "used [plaintiff's] confidential information to induce its customers to terminate their contracts" in violation of its nondisclosure agreement with plaintiff).

234. Furthermore, for the same reasons discussed above, Implus has likewise sufficiently alleged *how* Vore and Blue San had knowledge of the 2024 SRAs— through Bates and Hale directly informing Vore on 19 June 2024—and that Implus has suffered actual harm through Bates and Hale's purported breaches.

235. Accordingly, Vore and Blue San's Motion to Dismiss Implus's claim for tortious interference with the term and services provisions of the 2024 SRAs is **DENIED**.

### D. UDTP

236. "[O]ur courts have long recognized that claims for . . . tortious interference with contract may form the basis of a UDTP claim[.]" *S. Fastening Sys. v. Grabber Constr. Prods., Inc.*, 2015 NCBC LEXIS 42, at *28 (N.C. Super. Ct. Apr. 28, 2015) (cleaned up); *see also Bldg. Ctr., Inc. v. Lumber, Inc.*, 2016 NCBC LEXIS 79, at *30 (N.C. Super. Ct. Oct. 21, 2016) (holding that a validly pled tortious interference claim also "allege[s] sufficient facts for [a] UDTP claim to survive") (cleaned up).

237. Therefore, because the Court has concluded that Implus has stated valid claims for tortious interference with contract against Vore and Blue San, so too has Implus stated a valid claim for UDTP. *See, e.g., Greentouch USA, Inc. v. Lowe's Cos.*, 2024 NCBC LEXIS 132, at *26–27 (N.C. Super. Ct. Oct. 2, 2024) (holding that "the continued viability of [plaintiff's] tortious interference claims—without more—is sufficient to allow [plaintiff] to proceed on a UDTP claim") (cleaned up).

238. As a result, the Court need not determine whether Implus has adequately alleged other conduct that could independently sustain its UDTP claim. *See, e.g., Action Learning Assocs., LLC v. Kenan-Flagler Bus. Sch. Exec. Educ. LLC*, 2025 NCBC LEXIS 79, at *34 (N.C. Super. Ct. July 2, 2025) (concluding that "the Court need not decide . . . whether any of [p]laintiff's other allegations are

independently sufficient to support its UDTP claim" if the plaintiff has also stated a valid predicate claim).

239. Accordingly, Vore and Blue San's Motion to Dismiss Implus's UDTP claim is **DENIED**.

**E.  Civil Conspiracy**

240. Implus also seeks to hold Blue San jointly and severally liable for H.B. Shoes Co. and The Mike Hale Company's respective breaches of contract under a theory of civil conspiracy.

241. In order to state a claim for civil conspiracy, a plaintiff must allege: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros. v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350 (2011) (cleaned up).

242. Notably, "[c]ivil conspiracy is not an independent cause of action in North Carolina. Rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct." *McCarron v. Howell*, 2024 NCBC LEXIS 144, at *17 (N.C. Super. Ct. Nov. 19, 2024) (cleaned up); *see also Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002) (holding that "[o]nly where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement") (cleaned up).

243. In its proposed Third Amended Complaint, Implus describes the alleged conspiracy between Blue San, Bates, and Hale as follows:

> Upon information and belief based on document productions from Bates and Hale in December 2024 and January 2025, Vore and Blue San conspired with Bates and Hale to misappropriate Implus's confidential, proprietary, and trade secret information to compete with Implus. Blue San knowingly acquired confidential Implus sales and product information by requesting Bates and Hale, on behalf of H.B. Shoes and The Mike Hale Company, to send that information to Blue San, in violation of the confidentiality provisions in H.B. Shoes' 2012 and 2024 Sales Agreements and in violation of The Mike Hale Company's 2014 and 2024 Sales Agreements.
>
> . . .
>
> Blue San is also jointly and severally liable for H.B. Shoes' breach of Section 11 of H.B. Shoes' 2012 Sales Representative Agreement and Section 10 of H.B. Shoes' 2024 Sales Representative Agreement under a theory of civil conspiracy. Blue San and H.B. Shoes agreed to unlawfully misappropriate Implus's confidential information pursuant to a common scheme in which Bates, on behalf of H.B. Shoes, would forward the Implus/Customer 1 brand reports to Blue San, all in violation of H.B. Shoes' confidentiality obligations.
>
> . . .
>
> Blue San is also jointly and severally liable for The Mike Hale Company's breach of Section 11 of Hale's 2014 Sales Representative Agreement and Section 10 of Hale's 2024 Sales Representative Agreement under a theory of civil conspiracy. Blue San and The Mike Hale Company agreed to unlawfully misappropriate Implus's confidential information pursuant to a common scheme in which Hale, on behalf of The Mike Hale Company, would forward the Implus Sof Sole/Customer 2 brand reports to Blue San, all in violation of The Mike Hale Company's confidentiality obligations.

(TAC ¶¶ 74, 280, 293.)

244. Implus's claims for civil conspiracy fail for at least two reasons.

245. First, while Implus broadly alleges that Blue San "conspired" with Bates and Hale to misappropriate Implus's confidential, proprietary, and trade secret

information, Implus does not allege when, where, or how this conspiracy came to be. *See Bottom v. Bailey*, 238 N.C. App. 202, 213 (2014) (affirming dismissal where "[t]he claim suggest[ed] that defendants . . . conspired, but fail[ed] to allege how th[e] conspiracy came to be, or when, or where, or why").

246. Rather, the proposed Third Amended Complaint broadly references a series of email exchanges between Bates, Hale, and various Blue San employees. (*See* ECF No. 74.4 [sealed]; ECF No. 95 [public].) In those emails, Implus alleges that a conspiratorial agreement was formed when Blue San's employees asked Bates and Hale to forward them Implus's confidential client information—which is the subject of Implus's various breach of contract claims—and Bates and Hale acceded.

247. However, a "[p]laintiff cannot . . . use the same alleged acts to form both the basis of a claim for conspiracy to commit certain torts *and* the basis of the claims for those torts." *Jones v. City of Greensboro*, 51 N.C. App. 571, 584 (1981). As a result, contrary to Implus's arguments, the basis of the underlying unlawful acts—disclosing Implus's confidential information to Blue San—cannot also serve as the basis of the alleged conspiratorial agreement.

248. Furthermore, merely complying with a request does not—in and of itself—demonstrate a "common scheme" or "common objective." *See Muse v. Morrison*, 234 N.C. 195, 198 (1951) (noting that a conspiracy requires a "common scheme" and that an unlawful act must be committed "in furtherance of the common object[ive]" (cleaned up)). Here, the proposed Third Amended Complaint is devoid of any factual allegations satisfying this requirement.

249. Second, North Carolina does not appear to recognize a cause of action for civil conspiracy predicated on a claim for breach of contract. *See Krawiec*, 370 N.C. at 613–15 (affirming the trial court's dismissal of a claim for civil conspiracy—despite claims for breach of contract and unjust enrichment having survived—because "all underlying *tort* claims" had been properly dismissed (emphasis added)); *Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC*, 2021 NCBC LEXIS 15, at *24 (N.C. Super. Ct. Feb. 18, 2021) (holding that "when all underlying *tort* claims against a party are dismissed, the civil conspiracy claim against that party likewise fails" (emphasis added and cleaned up)); *Gottfried v. Covington*, 2014 NCBC LEXIS 26, at *19 n.5 (N.C. Super. Ct. June 25, 2014) (dismissing a civil conspiracy claim where the plaintiff "made no attempt to argue that the civil conspiracy claim was based on any other underlying *tort*" (emphasis added)).

250. At the 8 May hearing, counsel for Implus acknowledged that North Carolina law does not recognize an analogous claim for aiding and abetting breach of contract. (Tr., at 113–14; *see also Power Home Solar, LLC*, 2021 NCBC LEXIS 55, at *29 (concluding that the court "s[aw] no reason to recognize such a claim").

251. In refusing to recognize a claim for aiding and abetting breach of contract, our courts have recognized that such a claim is frequently characterized and analyzed by the courts of other jurisdictions as a tortious interference with contract claim. *See Krawiec v. Manly*, 2016 NCBC LEXIS 7, at *39 n.15 (N.C. Super. Ct. Jan. 22, 2016) (declining "to recognize a cause of action for aiding and abetting a breach of contract under North Carolina law" and observing that "[s]ome courts have noted

that 'aiding and abetting breach of contract' is akin to a claim for tortious interference with contract" (cleaned up)), *aff'd in part and rev'd in part on other grounds*, 370 N.C. 602 (2018).

252. For these reasons, Blue San's Motion to Dismiss Implus's claim for civil conspiracy to commit breach of contract is **GRANTED**, and that claim is **DISMISSED** with prejudice.

## IV. Implus's Motion to Dismiss

253. In the Amended Counterclaims, Blue San asserts claims against Implus for tortious interference with contract, tortious interference with economic advantage, abuse of process, and UDTP. Implus seeks dismissal of each of these claims in their entirety.

### A. Tortious Interference with Contract

254. In support of Blue San's claim for tortious interference with contract, the Amended Counterclaims allege as follows:

> On information and belief, in early June, Bates and Hale attended a conference by the Fashion Footwear Association of New York in New York City. While in New York, they met with Linden, the current Vice President of Strategic Accounts at Implus who, on information and belief, had previously shared information about Implus with Bates and Hale. Bates and Hale shared with Linden that they had begun working with Blue San and Vore as sales representatives focusing on the Specialty-Family Retailers.

> By this time, based on Implus's own decision to terminate their agreements in the midst of the COVID-19 pandemic, Bates and Hale had not been working for or doing business with Implus for over four years. On information and belief, Implus had continued to market and sell to the customers serviced by Bates and Hale using its in-house sales team. On information and belief, Linden, specifically, and Implus, broadly, nevertheless, did not take the news of Bates's and Hale's decision to work with Blue San well.

On information and belief, while in New York and after learning of Bates's and Hale's contractual and working relationship with Blue San, Linden, on behalf of Implus, offered to pay each of them somewhere in the range of $1,000 to $1,500 per month to simply cease and refrain from performing services for Blue San. The proposed payments were not for any bona fide services that Bates or Hale would provide to Implus, but rather were for the sole purpose of bribing them to end and prevent their work with Blue San. Bates and Hale refused the payments and expressed that the arrangement Linden was proposing was illegal, immoral, or both.

On information and belief, Linden then told Bates and Hale to give him some time to see what he could work out with Implus to prevent Bates and Hale from working for Blue San. A few days later, Linden, on behalf of Implus, proposed that Bates and Hale enter into a contract to serve as sales representatives exclusively for Implus.

In mid-June, Implus provided Bates and Hale each with a "Sales Representative Agreement" with a retroactive "Effective Date" of June 1, 2024 (together, the "Implus Agreements"). Neither Bates nor Hale had provided any services to Implus in June 2024.

On information and belief, when Implus provided the Implus Agreements, it was well aware that Bates and Hale both already had agreements to work as sales representatives exclusively for Blue San and were actively engaged in that work.

. . .

On information and belief, despite the fact that Bates and Hale are separate and independent sales representatives with their own businesses, Implus made clear to them that the deal it was offering was contingent on both of them agreeing to enter into the Implus Agreements and ceasing their relationships with Blue San. Pursuant to this all-or-nothing arrangement, if only one of them wanted to move forward with Implus, then the deal would be off the table for both, and any agreement signed by the other would be void.

On information and belief, the animating motive for the Implus Agreements, including the rich financial incentives, restrictive covenants, and the all-or-nothing ultimatum, was to put a stop to Bates's and Hale's work for Blue San and prevent them from working with Blue San in the foreseeable future, with the ultimate goal of preventing or delaying competition by Blue San. Implus itself had no actual need for Bates's or Hale's services, as evidenced by the initial offer to pay them

for no services, the all-or-nothing ultimatum, and the fact that it had been operating without their services for approximately four years.

. . .

Approximately 48 hours after Bates and Hale signed the Implus Agreements, they realized that they had made a mistake. Bates and Hale provided Implus with both verbal and written notice that they would not proceed with the Implus Agreements. At the time of this notice, Bates and Hale had not started working for Implus and had no contact with any existing or prospective customers on Implus's behalf.

Implus tried to push Bates and Hale to perform under the Implus Agreements, but they refused, making clear that they had no intention of working for Implus under the Implus Agreements or otherwise.

Implus has threatened and continues to threaten Bates and Hale that it will take aggressive steps to enforce the Implus Agreements against them, even though Bates and Hale received no confidential information and did no work for Implus after their previous agreements were terminated in 2020.

These threats have caused additional harm to Blue San and Vore. Because of such threats, Bates and Hale cut ties with Blue San and Vore for more than two months even after withdrawing from the Implus Agreements, despite not being subject to any enforceable restrictions against working with Blue San or Vore. This was a critical time for Blue San's development in the industry and Implus was successful in benching Blue San's sales representatives through its bribes and subsequent threats.

. . .

Implus, including through Linden's communications with Bates and Hale in New York in June 2024, had knowledge of the Blue San Agreements, the facts giving rise to those agreements, and the fact that Bates and Hale had commenced performance thereunder.

Implus intentionally induced Bates and Hale to breach the Blue San Agreements first by offering Bates and Hale monthly payments solely for ceasing and refraining from working for Blue San, next by inducing them to enter into the Implus Agreements in mid-June 2024, and then by threatening to sue Bates and Hale to enforce the Implus Agreements after Bates and Hale withdrew from them, inducing Bates and Hale to cut ties with Blue San.

Implus acted without justification and without a legitimate business purpose because its interference was not reasonably related to protection of a legitimate business interest. Instead, it was done in furtherance of Implus's anti-competitive objectives against Blue San and Vore, was done by improper means, and was done with malice.

Implus's tortious interference resulted in and proximately caused actual damages to Blue San by depriving Blue San of the benefit of the Blue San Agreements with Bates and Hale and, by extension, delaying its efforts to market and sell its footwear accessories and shoe care products to prospective customers.

(Am. Countercls. ¶¶ 65–70, 75–76, 78–81, 102–05.)

255. In seeking dismissal of this claim, Implus makes two arguments: (1) the purported Blue San Agreements are not valid contracts under North Carolina's statute of frauds, and (2) Implus acted with justification in that it was engaged in competitive business activity.

256. As to its first argument, Implus notes that the Amended Counterclaims concede that the Blue San Agreements were oral agreements and that Bates, Hale, and Blue San agreed not to reduce their terms to writing. Implus contends that such allegations are fatal to Blue San's claim because restrictive covenants (such as the Blue San Agreements' "exclusivity" requirement) are subject to the statute of frauds and cannot be enforced unless in writing. *See* N.C.G.S. § 75-4 (stating that "[n]o contract or agreement hereafter made, limiting the rights of any person to do business anywhere in the State of North Carolina shall be enforceable unless such agreement is in writing duly signed by the party who agrees not to enter into any such business within such territory").

257. However, this argument is premature. North Carolina's appellate courts have repeatedly held that the invocation of the statute of frauds—specifically

including N.C.G.S. § 75-4—is an affirmative defense and cannot be considered by the Court when ruling on a motion to dismiss. *Brooks Distrib. Co. v. Pugh*, 91 N.C. App. 715, 722–24 (1988) (Cozort, dissenting) (stating that "[i]t is inappropriate to consider . . . whether the contract fails to comport with [N.C.G.S. § 75-4], because the defense that the statute of frauds bars enforcement of a contract is an affirmative defense that can only be raised by answer or reply") (cleaned up), *dissent adopted per curiam*, 324 N.C. 326 (1989); *see also Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at *11–12 (N.C. Super. Ct. Dec. 12, 2016) (noting that "the [c]ourt cannot entertain the [defendants'] statute of frauds argument for dismissal" because "[i]t is inappropriate to consider, for purposes of a motion under [Rule] 12(b)(6), whether a contract fails to comport with the statute of frauds") (cleaned up).

258. As to its second argument, Implus contends that its alleged interference was privileged activity because employers are allowed to compete for the services of employees. For this reason, Implus argues, it was justified in offering Bates and Hale better contracts than Blue San had offered.

259. It is true that our Supreme Court has recognized that "[t]he free enterprise system demands that competing employers be allowed to vie for the services of the best and brightest employees without fear of subsequent litigation for tortious interference." *Peoples Sec. Life Ins.*, 322 N.C. at 222 (cleaned up). However, "the privilege to interfere is conditional or qualified; that is, it is lost if exercised for a wrong purpose. In general, a wrong purpose exists where the act is done other than

as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved." *Id.* at 220 (cleaned up).

260. Here, the Amended Counterclaims plainly allege that Implus's motive for interfering with the Blue San Agreements was not to protect its own interests, but rather an unlawful desire to prevent Blue San from being able to enter and compete in the market.

261. This allegation is supported by the alleged circumstances surrounding Implus's interference. Specifically, the Amended Counterclaims assert that after terminating its contracts with Bates and Hale in 2020, Implus made no attempts to contract with them until after learning of the Blue San Agreements. Moreover, Blue San alleges that Implus attempted to "bribe" Bates and Hale by offering them payment—not to induce them to perform any services on behalf of Implus but instead simply to stop working with Blue San. Then, after offering them contracts, Implus allegedly conditioned the 2024 SRAs on *both* Bates and Hale accepting the terms contained therein.

262. These allegations can be fairly read as claiming that Implus was not acting in a *bona fide* attempt to compete in the employment market for Bates and Hale and was instead only seeking to deny Blue San the benefit of the Blue San Agreements. As such, Blue San has sufficiently alleged that Implus's conduct was without justification. *See Vanfleet v. City of Hickory*, 2020 NCBC LEXIS 40, at *5, *11–12 (N.C. Super. Ct. Mar. 30, 2020) (denying a motion to dismiss based on the allegation that the defendants "conspir[ed] to destroy [plaintiff's] business" and

"damage [plaintiff's] reputation"); *Greentouch USA, Inc.*, 2024 NCBC LEXIS 132, at *23 (concluding that allegations concerning "intentional and malicious business practices . . . designed and intended to destroy [plaintiffs]" were sufficient to withstand a motion to dismiss).

263.    Accordingly, Implus's Motion to Dismiss Blue San's claim for tortious interference with the Blue San Agreements is **DENIED**.

**B.    Tortious Interference with Prospective Economic Advantage**

264.    "To state a claim for tortious interference with prospective economic advantage, a plaintiff must show that the defendant, without justification, induced a third party to refrain from entering into a contract with the plaintiff and which would have been entered into absent the defendant's interference." *Silverdeer, LLC v. Berton*, 2013 NCBC LEXIS 21, at *31 (N.C. Super. Ct. Apr. 24, 2013) (cleaned up).

265.    Furthermore, "the plaintiff must allege facts to show that . . . [a] contract would have ensued but for the interference." *Radcliffe v. Avenel Homeowners Ass'n*, 248 N.C. App. 541, 567 (2016) (cleaned up). "Our Supreme Court has held that a plaintiff must identify a *specific* contractual opportunity that was lost as a result of the defendant's allegedly tortious conduct in order to sustain a claim for interference with prospective economic advantage." *MarketPlace 4 Ins.*, 2023 NCBC LEXIS 31, at *37 (citing *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 701 (2016) (holding that "a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention" (cleaned up))); *see also Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at *29 (concluding that

allegations concerning the plaintiff's "reasonabl[e] expect[ion] that, but for [d]efendants' conduct, its business relationships with its customers would have continued and grown" failed to identify a specific lost contractual opportunity).

266. Blue San's claims for tortious interference with prospective economic advantage allege that Implus has interfered with Blue San's relationships with Bates, Hale, and its prospective customers.

### 1. Bates and Hale

267. Blue San's counterclaim for tortious interference with prospective economic advantage concerning its relationship with Bates and Hale is pled in the alternative to its claim for tortious interference with the Blue San Agreements. Blue San contends that if the Blue San Agreements are found to be unenforceable, Blue San would have nonetheless entered into enforceable contracts with Bates and Hale but for Implus's interference.

268. Implus asserts that this claim fails because (1) its interference was justified, and (2) the Amended Counterclaims expressly concede that Blue San, Bates, and Hale agreed not to enter into any written agreements.

269. With regard to the first argument, the Court has already concluded that the Amended Counterclaims sufficiently allege that Implus's interference was not a *bona fide* attempt to hire the "best and brightest" employees but was instead done solely for the purpose of harming Blue San. The same is true for Blue San's alternative claim for tortious interference with prospective economic advantage. *See, e.g., Avadim Health, Inc. v. Harkey*, 2021 NCBC LEXIS 104, at *16–23 (N.C. Super.

Ct. Nov. 30, 2021) (holding that conduct that was "without justification" for a claim for tortious interference with contract was equally "without justification" for a claim of tortious interference with prospective economic advantage).

270. As to Implus's second argument, whether Blue San, Bates, and Hale would have entered into *written* agreements (as opposed to oral agreements) is only relevant to the extent that N.C.G.S. § 75-4 requires certain contracts to be in writing. However, as the Court has already noted, the Court cannot consider the application of the statute of frauds at the motion to dismiss stage. *See, e.g., Green v. Harbour*, 113 N.C. App. 280, 281 (1994) (noting that "defendants may not take advantage of the provisions of the statute of frauds by a motion to dismiss or failure to state a claim upon which relief could be granted").

271. As such, Blue San's allegations that Blue San would have entered into enforceable contracts (whether written or oral) for Bates and Hale to serve as its independent contractor sales representatives but for Implus's interference is sufficient at this stage of the litigation. *See Lunsford v. Vianoe Servs., LLC*, 2020 NCBC LEXIS 111, at *16 (N.C. Super. Ct. Sept. 28, 2020) (denying a motion to dismiss where the complaint "allege[d] that [plaintiff] would have obtained contracts . . . but for the acts of [defendant]").

272. Therefore, Implus's Motion to Dismiss Blue San's alternative claim for tortious interference with prospective economic advantage with respect to Bates and Hale is **DENIED**.

### 2. Prospective Customers

273. With regard to Implus's alleged interference with Blue San's prospective customers, the Amended Counterclaims allege the following:

> On information and belief, more recently, and despite its insistence that Vore must not discuss Implus in the market, Implus's sales force has told its customers (Blue San's prospective customers) about the lawsuit and suggested that the lawsuit may result in Blue San being unable to deliver product to those customers. In late 2024, Blue San heard from one Specialty-Family Channel retailer with whom Blue San was seeking business that it had learned of the litigation from Implus and, on information and belief, as a result of that conversation feared that the litigation would result in Blue San being unable to deliver product. As a result, this retailer opted not to place an order with Blue San for the spring 2025 season.

> In addition, also in late 2024, another retailer in the Specialty-Family Channel that had previously expressed significant interest in working with and placing orders with Blue San slowed its discussions with Blue San. That retailer did not cite the litigation as a reason for doing so, but the timing suggests that this retailer too was targeted by Implus's inaccurate statements about the litigation.

> This caused immediate and long term harm to Blue San. In the immediate term, Blue San did not receive orders from these customers that it otherwise would have. In the long term, it missed an opportunity to get its foot in the door, which, on information and belief, would have resulted in additional orders being placed in future seasons.

> . . .

> Implus intentionally made misleading and/or inaccurate statements about the Vore Lawsuit and the potential relief and outcome in this litigation to at least two specific Specialty-Family retailers that are current Implus customers and prospective Blue San customers.

> But for Implus's interference, those customers would have placed orders for products from Blue San and would have further developed a business relationship with Blue San. At present, those customers have declined to place orders and/or are delaying their orders until the litigation is resolved.

Implus acted without justification and without a legitimate business purpose because its interference was not reasonably related to protection of a legitimate business interest. Instead, it was done in furtherance of Implus's anti-competitive objectives against Blue San and Vore, was done to injure and gain an advantage at the expense of Blue San and was done with malice.

(Am. Countercls. ¶¶ 94–96, 129–31.)

274. Implus argues that these allegations are insufficient because (1) it has a legitimate business interest in communicating with its own customers, and (2) the Amended Counterclaims fail to adequately allege that the prospective customers would have entered into contracts with Blue San "but for" any conduct attributable to Implus.[8]

275. Once again, contrary to Implus's first argument, the Amended Counterclaims do not allege that Implus contacted Blue San's prospective customers out of a *bona fide* competitive interest.

276. Rather, Blue San alleges that Implus acted solely with "anti-competitive" motives in an effort to prevent Blue San from competing in the market. This is made clear, Blue San contends, by the allegation that Implus did not merely "inform" the prospective customers about the present lawsuit, but that Implus instead made "misleading" and "inaccurate statements" concerning the potential impacts of this litigation on Blue San. Similar allegations have been held to be sufficient to survive a motion to dismiss. *See Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at *21–23 (noting that while "inflammatory," allegations that the defendant "used

---

[8] At the 8 May hearing, counsel for Implus conceded that even though the Amended Counterclaims do not specifically identify the two prospective customers, Implus is aware of the identities of the prospective customers being referenced.

anti-competitive business tactics designed to restrain [plaintiff's] ability to compete for . . . the business of its customers" were sufficient to state a claim); *ALP Sys., Inc. v. Haygood*, 2021 NCBC LEXIS 51, at *21–22 (N.C. Super. Ct. May 10, 2021) (concluding that allegations that the defendant "misle[d] [plaintiff's] customers, without justification" demonstrated legal malice).

277. The Court's ruling on Implus's second argument is more nuanced. With respect to the prospective customer referenced in paragraph *94* of the Amended Counterclaims, the Court is satisfied that Blue San has sufficiently alleged that Implus contacted that prospective customer, provided it with misleading information about the present lawsuit, and that—as a result—the prospective customer did not enter into a contract with Blue San that it otherwise would have absent Implus's interference.

278. However, with regard to the prospective customer referenced in paragraph *95*, the Court agrees that Blue San has failed to adequately allege that it would have entered into a contract "but for" any conduct attributable to Implus. The Amended Counterclaims merely allege that the "timing" of that prospective customer's decision "suggests" interference by Implus. Moreover, the Amended Counterclaims candidly admit that the prospective customer did not cite the present litigation or any conduct attributable to Implus as the reason for its decision not to enter into an agreement with Blue San.

279. Such allegations are not enough to state a claim for tortious interference with prospective economic advantage. *See Wells Fargo Ins. Servs. USA*, 2018 NCBC

LEXIS 42, at \*45 (dismissing a claim because while alleging that its employees "resigned from [plaintiff], became employed with [defendant], and subsequently diverted several customers from [plaintiff] to [defendant][,]" the complaint did not allege that the defendant recruited plaintiff's employees or induced them to breach their non-solicitation agreements).

280.     Therefore, Implus's Motion to Dismiss Blue San's claim for tortious interference with prospective economic advantage is **GRANTED** with respect to the prospective customer referenced in paragraph 95 of the Amended Counterclaims, and that claim is **DISMISSED** with prejudice.  However, Implus's Motion to Dismiss is **DENIED** with regard to the prospective customer referenced in paragraph 94 of the Amended Counterclaims.

## C.     Abuse of Process

281.     "Abuse of process is the misuse of legal process for an ulterior purpose." *Fox v. City of Greensboro*, 279 N.C. App. 301, 326 (2021) (cleaned up).  "Abuse of process requires both an ulterior motive and an act in the use of the legal process not proper in the regular prosecution of the proceeding, and that both requirements relate to the defendant's purpose to achieve through the use of the process some end foreign to those it was designed to effect." *Fuhs v. Fuhs*, 245 N.C. App. 367, 375 (2016) (cleaned up).

282.     Our Supreme Court has stated the following with regard to pleading a claim of abuse of process:

> The ulterior motive requirement is satisfied when the plaintiff alleges that the prior action was initiated by defendant or used by him to

achieve a collateral purpose not within the normal scope of the process used. The act requirement is satisfied when the plaintiff alleges that once the prior proceeding was initiated, the defendant committed some wil[l]ful act whereby he sought to use the existence of the proceeding to gain advantage of the plaintiff in respect to some collateral matter.

*Stanback v. Stanback*, 297 N.C. 181, 201 (1979) (cleaned up).

283. The Amended Counterclaims allege that Implus has committed various abuses of process in the present action through the following conduct:

> After Implus filed the Vore Lawsuit, it attempted to overtly use the lawsuit and the threat of ongoing and costly litigation as leverage to further its anti-competitive ends against Blue San.

> For example, even though Implus originally brought no claims against Blue San, it notified Blue San of the Vore Lawsuit by sending document preservation notices to Chang and Jones. On information and belief, Implus did so for the purpose of intimidating Blue San and chilling its efforts to enter the footwear accessories and shoe care market and compete directly with Implus.

> On information and belief, Implus also informed Bates and Hale about the Vore Lawsuit and sought to leverage it for the purpose of preventing Bates and Hale from continuing to work with Blue San pursuant to the Blue San Agreements, including by demanding that Bates and Hale provide Implus with "assurances" that they would refrain from performing any work or services for Vore and Blue San despite having no enforceable contractual obligation to do so.

> Implus also leveraged the Vore Lawsuit to demand "assurances" from Vore through his counsel. After initiating the litigation, Implus asked Vore's lawyer to provide "assurances" that he (and by extension Blue San) would refrain from working with Bates and Hale, despite the fact that Blue San had pre-existing contractual arrangements with them. Implus also demanded that Vore refrain from discussing anything about Implus with others in the market, regardless of whether or not the discussion had any relationship to information that Vore received as an IM Group Holdings shareholder.

> . . .

> The Vore Lawsuit is a sham lawsuit. In bringing the Vore Lawsuit, Implus's true and ulterior motive was, *inter alia*, to: (1) prevent or hinder Vore's work for Blue San, including by interfering with Vore's

ability to interact with prospective customers and win business away from Implus; (2) interfere with Blue San's contractual and business relationship with Bates and Hale; and (3) prevent or delay Blue San's entry into the market and its direct competition with Implus.

After bringing the Vore Lawsuit, Implus maliciously used the legal process by sending preservation notices to Blue San through its principals, who were entirely unrelated to the claims brought and the theories alleged in the Vore Lawsuit, in a threatening manner and in furtherance of its efforts to improperly and unfairly suppress competition from Blue San.

On information and belief, prior to sending the preservation notices to Blue San's principal, Implus conducted no independent factual investigation to determine whether Blue San or its principals had documents or information relevant to the Vore Lawsuit.

Implus further maliciously used the legal process to improperly impede Blue San's pre-existing, independent contractor relationship with Bates and Hale by leveraging the Vore Lawsuit to demand assurances from Bates and Hale, who were also not parties to the Vore Lawsuit, regarding their continuing work with Blue San. The assurances that Implus demanded extended well beyond any enforceable provisions of the restrictive covenants contained in the Implus Agreements.

Implus also maliciously used the legal process by leveraging the Vore Lawsuit to demand assurances from Vore through his litigation counsel that would hinder Blue San's ability to enter and compete in the marketplace. These assurances also included terms that Implus has not sought in this action and that this Court could not award even if Implus prevails.

(Am. Countercls. 88–91, 121–25.)[9]

---

[9] The Court notes that these allegations solely concern Implus's actions taken with respect to specific individuals—Chang, Jones, Bates, Hale, and Vore—rather than with respect to Blue San. *See Rendina v. Clausen*, 2006 U.S. Dist. LEXIS 108609, at *40 (M.D.N.C. Feb. 17, 2006) (holding that an abuse of process claim was "flaw[ed]" in that "the actions [constituting an abuse of process] were not even taken against [defendant]"); *Drs. Making Housecalls-Internal Med., P.A. v. Onsite Care, PLLC*, 2019 NCBC LEXIS 6, at *24 (N.C. Super. Ct. Jan. 16, 2019) (dismissing an abuse of process claim where the process "was filed against [a non-party] only, not [d]efendant" and "[d]efendant d[id] not allege that it took any action regarding" the process or plead "how it was . . . injured by the filing" of the process).

### 1. Sending Document Preservation Letters

284. Blue San's first abuse of process theory concerns document preservation letters that Implus's counsel mailed to Chang and Jones immediately after filing the Vore Complaint. Blue San contends that these letters were sent for the improper purpose of intimidation.

285. The preservation letters at issue are substantively identical and read as follows:

> Our firm represents Implus Footcare, LLC and IM Group Holdings Corporation (together, "Implus") in the matter of *Implus Footcare, LLC et al. v. Todd Vore*, which was commenced on July 2, 2024 in the North Carolina Business Court. The lawsuit involves allegations that Mr. Vore breached his confidentiality obligations as an Implus shareholder and unlawfully disclosed and used Implus's proprietary financial and business information. A copy of the complaint is attached for your convenience.
>
> We believe that you may be in possession of documents and information relevant to the claims and defenses in the lawsuit. We hereby formally request that you preserve all documents related to the allegations and claims in the complaint, including all communications you've had with, or any information you've received from, Mr. Vore—regardless of whether you believe it is relevant.
>
> We further request that you establish safeguards against the modification or destruction of paper records and electronically-stored information related to the relevant documents described herein, including but not limited to:
>
> 1. Communications, documents, and any other information concerning Implus, including but not limited to Implus's financial condition and strategic plans;
>
> 2. Communications, documents, and any other information concerning any former or current Implus sales representatives and/or their contractual agreements with Implus; and

3. Communications, documents, and any other information obtained from Vore concerning any plans to offer products competitive to Implus's.

For the sake of clarity, please note that we seek preservation of all electronic mail and information about electronic mail (including message contents, header information and logs of electronic mail system usage), calendar entries, instant messages, text messages, or any other form of communication, including but not limited to content on WhatsApp, Slack, or similar messaging systems, sent or received by you, as well as all other electronic data containing information relating to the herein referenced topics, including but not limited to any file transfer site, data storage, backup, floppy disks, zip drives, zip files, tapes, compact disks, laptops, handheld devices, flash drives, disconnected hard drives, and other removable electronic media. This includes the suspension of all automatic deletion processes you may currently have in place.

Finally, we request that you reply to this letter via email to jwenker@ktslaw.com to confirm your receipt and understanding of the requests made herein. We greatly appreciate your attention to this matter. Please feel free to contact me should you have any questions about the above preservation request or, if you are represented by an attorney, please have your attorney contact me instead. We look forward to your prompt response.

(ECF No. 46.3, at 1–2, 4–5.)

286. Although Blue San alleges that Implus's subjective motivation for sending the letters was malicious, this assertion is contradicted by the plain text of the letters themselves. *See In re GM Co. Derivative Litig.*, 2015 Del. Ch. LEXIS 179, at *18 n.33 (Del. Ch. June 26, 2015) (noting that "[e]ven on a motion to dismiss, where [the court] accept[s] all of the non-moving party's facts as true and draw[s] all *reasonable* inferences in their favor, [the court] need not accept a characterization of a document that is clearly contrary to the face of the document") (cleaned up).

287. Indeed, as was conceded by Blue San's counsel at the 8 May hearing, the preservation letters—on their face—are "vanilla," "innocuous," and "routine." (Tr., at

193–94.) Furthermore, it was not "illogical for Implus to assume that [Chang and Jones] might have discoverable information" based on the allegations raised in the Vore Complaint. (Tr., at 193.)

288. Accordingly, the Court rejects this basis for Blue San's abuse of process counterclaim. *See Mfrs. & Jobbers Fin. Corp. v. Lane*, 221 N.C. 189, 196–97 (1942) (holding that "[t]here is no abuse of process where [the use of process] is confined to its regular and legitimate function in relation to the cause of action stated in the complaint") (cleaned up).

### 2. Demanding "Assurances" from Bates and Hale

289. Blue San's second theory concerns certain demands for "assurances" that Implus's counsel allegedly made to Bates and Hale (through their then-counsel).

290. As Blue San's counsel acknowledged at the 8 May hearing, the substance of these "demands" is contained in the record. (Tr., at 194–95; *see* ECF No. 74.3.)

291. Specifically, in an email sent on 21 June 2024 to Bates and Hale's then-counsel, Implus's counsel stated as follows:

> Thank you for calling me back yesterday. As I mentioned, your email below was very surprising and concerning to Implus. You indicated you were not authorized to share any information with me about this situation, and it sounded as though your clients specifically requested that you refrain from sharing any information, which only served to heighten our concerns. As I mentioned, given what has transpired and your client's unwillingness to share any details, the logical conclusion is that your clients are repudiating their respective June 17, 2024 Sales Representative Agreements ("Agreement(s)") with Implus because they are working with a competing person or entity. This would violate their non-compete provision in section 10 of the Agreements. Further, as I mentioned, in reliance upon these binding agreements, Implus has already shared Trade Secrets (as defined in the Sales Representative Agreements) with both of your clients, including via email on June 18,

of which you stated you were not aware. I asked you to check with your clients to see if there was any information they could provide to explain their actions, but I have not yet heard back from you.

I also asked that you remind your clients of their obligations in the Agreements, which Implus believes are binding and enforceable, including both the non-compete and nondisclosure provisions. You indicated that your clients are aware of those provisions. If either of your clients have violated or are violating, or *arguably* have violated or are violating, any of their obligations in the Agreements, we demand that they immediately cease and desist that activity and that you let us know immediately including providing us with details about that activity so that Implus can take action to limit any damage that has occurred or may occur. Further, we request that each of your clients provide the following acknowledgements and assurances in a signed writing immediately:

- The attached Sales Representative Agreement I signed on June 17, 2024 is binding and enforceable.

- I have read, understood, and complied with all of my obligations and requirements contained in that Sales Representative Agreement, and I will continue to comply with those obligations.

- At the time I signed the Sales Representative Agreement, I was not a party to any contract or agreement with any person or entity related to providing services as a sales representative, and was not providing services as a sales representative, to any such person or entity regarding products that are competitive with any of Implus' Products (as defined in the Agreement).

- Since signing the Sales Representative Agreement, I have not entered into any contract or agreement with any person or entity related to providing services as a sales representative, and am not providing services as a sales representative, to any such person or entity regarding products that are competitive with any of Implus' Products (as defined in the Agreement).

- I do not currently have any plans to enter into any contract or agreement with any person or entity related to providing services as a sales representative to any person or entity regarding products that are competitive with any of Implus' Products (as defined in the Agreement), and I understand that section 10 of the Sales Representative Agreement prohibits me from engaging in such conduct.

- If I intend to enter into any such contract or agreement at any time prior to June 16, 2027, I will immediately notify Implus.

- For Mike Hale: I understand that Implus has disclosed to me Trade Secrets pursuant to the Sales Representative Agreement (including Implus' strategy for Famous Footwear, annual sales data for several Implus customers, and business plans and strategy for how to approach certain customers), I have complied with the obligations in section 10 of the Sales Representative Agreement, and I will continue to comply with those obligations, including refraining from either disclosing any Trade Secrets to any Person or making use of such Trade Secrets for the benefit of myself or any other Person other than Implus. I have provided all such Trade Secrets, and all documents and communications about those Trade Secrets, to my attorney and thereafter permanently deleted all such Trade Secrets in my possession and will not access them again.

- For Hugh Bates: I understand that Implus has disclosed to me Trade Secrets pursuant to the Sales Representative Agreement (including annual sales data for several Implus customers and business plans and strategy for how to approach certain customers), I have complied with the obligations in section 10 of the Sales Representative Agreement, and I will continue to comply with those obligations, including refraining from either disclosing any Trade Secrets to any Person or making use of such Trade Secrets for the benefit of myself or any other Person other than Implus. I have provided all such Trade Secrets, and all documents and communications about those Trade Secrets, to my attorney and thereafter permanently deleted all such Trade Secrets in my possession and will not access them again.

Finally, Implus demands that, in addition to the above request that your clients provide you with the Trade Secrets and all documents and communications about the Trade Secrets before permanently deleting them, your clients take all appropriate steps to retain and preserve all other documents, communications, data and things potentially relevant or related to (1) Implus (including but not limited to any information shared by Implus with them, including Trade Secrets) and (2) any person or entity with whom your clients have worked, are working, or intend to work between January 1, 2024 and June 16, 2027, including all work performed for all such persons or entities.

> Please provide me with a complete response by 5 pm ET today regarding the above-requested information. If I do not hear from you by then, or we do not receive complete information by then, Implus will assume your clients do not intend to provide this information and will govern itself accordingly.

(ECF No. 74.3, at 4–6.)

292. As an initial matter, the Court notes that these "demands" were first made upon Bates and Hale through their then-counsel on 21 June 2024—eleven days prior to the Vore Complaint being filed. Because it pre-dates the filing of the Vore Complaint, the email from Implus's counsel cannot—by definition—be a "use of process" because no "process" then existed. *See Melton v. Rickman*, 225 N.C. 700, 704 (1945) (holding that a claim for abuse of process requires "the malicious misuse or misapplication of that process *after issuance*") (emphasis added); *Fuhs*, 245 N.C. App. at 376 (noting that the "act requirement" for an abuse of process claim requires the defendant to commit some willful act "once the prior proceeding was initiated") (cleaned up); *Stanback*, 297 N.C. at 201 (concluding that a claim failed absent allegations of misconduct "once [defendant] initiated the suit against [plaintiff]").

293. Furthermore, based on a careful reading of the requested "assurances," the Court is unable to agree with Blue San that the statements contained therein— or their surrounding circumstances—are sufficient to form the basis for an abuse of process claim. *See Rendina*, 2006 U.S. Dist. LEXIS 108609, at *39 (finding no abuse of process based on allegations that the defendant "us[ed] his status as an attorney to harass [plaintiff] into settling").

### 3. Demands for "Assurances" from Vore

294. Blue San's third—and final—theory of abuse of process concerns certain demands for "assurances" that Implus's counsel purportedly made to Vore (through his counsel).

295. Although the Amended Counterclaims are not explicit as to the nature of the demands for "assurances" sought from Vore, Blue San contends that Implus (through its counsel) used the Vore Complaint as improper leverage by making demands of Vore for relief beyond what it has sought in this litigation.

296. However, Blue San has failed to offer any persuasive legal authority for the proposition that parties to a lawsuit expose themselves to liability for abuse of process simply by making demands that exceed relief specifically referenced in the pleadings. Nor would such an argument be logical—particularly here, where the "demands" were allegedly communicated through the parties' counsel. *See Rockingham Square Shopping Ctr., Inc. v. Integon Life Ins.*, 52 N.C. App. 633, 646 (1981) (holding that an offer "to delay its foreclosure, in return for certain concessions, while plaintiffs attempted to sell the shopping center" was "a legitimate effort by the parties to avoid foreclosure," not an abuse of process); *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 211 (2016) (affirming dismissal of an abuse of process claim based on the "totality of the circumstances" which included subpoenas "attached to a letter that conditioned an offer to settle upon plaintiff's payment of money to defendants"); *L. Offs. of Matthew K. Rogers, PLLC v. Fisher*, 2020 N.C. App. LEXIS 649, at *28–30 (N.C. Ct. App. Sept. 15, 2020) (unpublished) (holding that an attorney

"making a settlement offer . . . after the initiation of the lawsuit, is . . . an action confined to its regular and legitimate function" and that "merely filing and subsequently seeking to settle the lawsuit falls short of the malice required to show ulterior motive" (cleaned up)). Accordingly, this theory likewise fails.

297. Implus's Motion to Dismiss Blue San's counterclaim for abuse of process is therefore **GRANTED**, and the claim is **DISMISSED** with prejudice.

**D.     UDTP**

298. As noted above, "claims for . . . tortious interference with contract may form the basis of a UDTP claim." *Charrah, LLC v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 52, at \*19 (N.C. Super. Ct. Apr. 17, 2020) (cleaned up). So too may claims for tortious interference with prospective economic advantage. *See, e.g., Husqvarna Pro. Prods., Inc. v. Robin Autopilot Holdings, LLC*, 2023 NCBC LEXIS 155, at \*28–29 (N.C. Super. Ct. Nov. 28, 2023) (concluding that the "alleged tortious interference with [plaintiff's] prospective contract" was independently sufficient to sustain a claim for UDTP) (cleaned up).

299. Therefore, based on the Court's ruling that Blue San has stated valid claims for tortious interference with contract and tortious interference with prospective economic advantage, so too has it sufficiently stated a claim for UDTP.

300. Because the Court concludes that Blue San's allegations of tortious interference are sufficient to support a claim for UDTP, the Court need not address whether the remaining allegations in the Amended Counterclaims are independently sufficient. *See, e.g., Innovare, Ltd. v. Sciteck Diagnostics, Inc.*, 2023 NCBC LEXIS 8,

at *39 n.8 (N.C. Super. Ct. Jan. 19, 2023) (noting that "the Court need not address . . . whether any of the other conduct alleged in [defendant's] counterclaims likewise suffices to establish liability under Chapter 75" because plaintiff had adequately pled a predicate claim).

301. Accordingly, Implus's Motion to Dismiss Blue San's Counterclaim for UDTP is **DENIED**.

## CONCLUSION

**THEREFORE, IT IS ORDERED** as follows:

1. The Motion to Amend is **GRANTED**, and Implus is **DIRECTED** to file its Third Amended Complaint **on or before 18 September 2025** in substantially the same form set out in ECF No. 110.1, **except** that the Third Amended Complaint shall **not** contain those claims carried over from its Second Amended Complaint that have been dismissed in this Opinion.[10]

2. The Motions to Dismiss are **GRANTED** with respect to the following claims, and they are hereby **DISMISSED** with prejudice:

    a. Implus's claims against H.B. Shoes Co. and The Mike Hale Company for breach of Section 9 of the 2024 SRAs;

    b. Implus's claims against Vore for breach of the implied covenant of good faith and fair dealing with respect to Section 2.8 of the

---

[10] For clarity, prior to filing the Third Amended Complaint, Implus must remove from the version of the document contained in ECF No. 110.1 the specific claims that the Court has dismissed herein.

IMGH Stockholders Agreement and misappropriation of trade secrets;

c.  Implus's claims against Blue San for misappropriation of trade secrets and civil conspiracy; and

d.  Blue San's counterclaims against Implus for abuse of process and tortious interference with prospective economic advantage relating to the prospective customer discussed in paragraph 95 of the Amended Counterclaims.

3.  In all other respects, the Motions to Dismiss are **DENIED**.


**SO ORDERED**, this the 11th day of September 2025.


/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases